336 F.2d 21
 W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,
v.
C & P SHOE CORPORATION, Appellee.
C & P SHOE CORPORATION, Appellant,
v.
W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellee.
 No. 20813.
 United States Court of Appeals Fifth Circuit.
 August 20, 1964.
 
 COPYRIGHT MATERIAL OMITTED Miss Beate Bloch, Atty., Dept. of Labor, Washington, D. C., Miss Bessie Margolin, Associate Sol., for appellant.
 Maurice Epstein, Boston, Mass., for appellee.
 Before RIVES and JONES, Circuit Judges, and BOOTLE, District Judge.
 BOOTLE, District Judge.
 These appeals present for the second time, five consolidated actions brought by the Secretary of Labor under Section 16(c) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(c) pursuant to the written request of thirty-three (33) employees of C & P Shoe Corporation to recover unpaid minimum wages and overtime compensation. On the former appearance of these cases before this Court, it was held that the entry of the shoes into defendant's warehouse did not terminate their interstate journey, but constituted only a temporary pause for convenience in the process of getting them to their final destination, the retail stores. Mitchell v. C & P Shoe Corporation, 286 F.2d 109 (5th Cir. 1960). Our former opinion described defendant's business operations as follows: "Appellee, C & P Shoe Corporation, and its four subsidiary corporations own and operate twenty retail shoe stores within the State of Florida. C & P also owns and operates a central office and warehouse in Fort Lauderdale, Florida. The employees whose activities are involved in this case work in and about the Fort Lauderdale warehouse. Substantially all of the shoes which are sold at retail by the C & P chain are first received at the Fort Lauderdale warehouse from manufacturers and suppliers located outside the State of Florida. At the warehouse, the shoes are unloaded, and a receiving list is prepared, noting the types, sizes and styles of shoes received. This list is sent to the office, where distribution sheets are then prepared designating those stores which will receive the shoes. The cartons in which the shoes arrive are then broken down and the shoes separated in accordance with the distribution sheet. The shoes are `tagged' with a price and code number and shipped on to the retail stores. About half the shoes are distributed immediately following their receipt at the warehouse. The remainder are stacked in the warehouse, where a 30 day inventory is maintained." Mitchell v. C & P Shoe Corporation, supra at 110.
 We remanded for findings "on the question of whether the individual plaintiffs devoted a `substantial' part of their work to the interstate operations of the C & P Shoe Corporation" and for determination of other issues left open by the appeal. After further hearings, the District Court found that "the defendant operated a chain store operation of a hybrid retail-wholesale nature. The defendant's central office and warehouse performed certain functions which are customarily performed by wholesalers, and certain other functions customarily performed by retail establishments." Based on this finding, the District Court concluded that those employees whose activities are limited to the retail aspects of this hybrid operation are engaged in a local retail activity and the employer may plead and prove the defense of exemption under Section 13(a) (2). The District Court also held that the exemption under Section 13(a) (1) of the Act which exempts from coverage "any employee employed in a bona fide executive, administrative, professional, or local retailing capacity" applied to certain employees and that Section 13(b) (1) which exempts from Section 7 of the Act "any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service" applied to certain employees.
 Each side has appealed. The Secretary has assigned several specifications of error, which he has conveniently grouped under three points as follows.
 * "Defendant should have been held bound by its admissions as to the duties regularly performed by the `taggers,' and, accordingly, judgment on behalf of the Secretary on their claims should have included compensation for underpayments during every workweek of their employment."
 With respect to each tagger, the Secretary requested the defendant, pursuant to Rule 36, Fed.R.Civ.P., to admit that the tagger "was employed by the defendant in its warehouse at Fort Lauderdale, Florida, during workweeks between (specified dates), and regularly each week of her employment devoted a substantial amount of her time to handling, moving, and tagging shoes with code and price numbers, which shoes had been received at said warehouse" and the defendant in writing answered each of said requests as follows: "Defendant admits the allegations of paragraph (the designated paragraph) except that her duties did not include handling or moving shoes except in connection with her performance of her duties as tagger, and with the further understanding that the `code' number refers to style number and that the tagging was done after the shoes had been stored on the shelves and had been subsequently removed from the shelves for shipment to a store."
 The tagging operation was as follows: Upon arrival of the shoes from outside the State of Florida at the warehouse, some warehouse employees received them and prepared a receiving record on which was listed the stock number of the shoe and other pertinent data. This receiving sheet was then turned into the office and the office would, in turn, designate distribution for the shoes indicating to what stores the shoes were to be sent. Then the shoes were moved by the warehouse men to the tagging table in carts. The shoes by that time had been removed from the large cartons, but were still in the shoe boxes. The taggers then make out tickets or tags showing the stock number and size and retail price. The taggers then remove the shoes from the individual boxes, pierce the shoes with a very sharp needle, thereby fastening or tying each pair of shoes together and ticketing or tagging them with the stock number, size and retail price, and then put the shoes back in the box, the boxes then being placed on a conveyor belt for storage or immediate delivery to the retail stores.
 The District Court held, and we agree, that in all weeks when the regular tagging procedure above outlined was followed, the activities of the taggers were directly concerned with movement of these shoes in commerce, and that during all such weeks the taggers were engaged in commerce within the meaning of the Act.
 Notwithstanding the above quoted requests for admissions and answers thereto, the District Court permitted the defendant to offer evidence as to a more limited activity of the taggers during certain periods of the year, thereby relieving the defendant from its admission that "during * * * and regularly each week of her employment (she) devoted a substantial amount of her time to handling, moving, and tagging shoes with code and price number * * *", concluding that "the qualified nature of the defendant's admissions to the generalized request for same did not preclude further proof in detail of the exact nature of the duties of the respective taggers." The Secretary vigorously contends that it was error for the District Court to accept such evidence in view of what the Secretary regards as a solemn and binding admission that during each and every week of the tagger's employment, the tagger devoted a substantial amount of her time to handling, moving, and tagging shoes, and in view of the fact that the defendant gave to the Secretary no advance notice that it would seek relief from its admissions so that the Secretary was left at the trial unprepared to offer evidence as to an issue of fact which he contends was long since precluded by admissions. We find it unnecessary to decide whether or not, under the facts of this case, the District Court erred in relieving the defendant from its admissions, because we are of the opinion that, notwithstanding the evidence adduced by the defendant as to a more limited activity on the part of the taggers, such more limited activity was directly concerned with the movement of these goods in commerce and still caused the taggers to be engaged in commerce within the meaning of the Act. The more limited activity was as follows: If it was at all possible to get the shoes tagged, the defendant would get them tagged, but on occasions it could not get them tagged because of the rush. These rush seasons were six to eight weeks immediately preceding Easter, Christmas and the opening of school. During those weeks, the taggers devoted all of their time to making the tickets so that they could be inserted into the cases that the shoes were in, so that the stores would have the tickets with which to ticket the merchandise. The retail stores had no machines with which to make tickets. The only machines for making tickets were in the warehouse. All that the taggers did during these rush periods was to make tickets and then other employees of defendant would put the tickets in the original cases with the shoes, and the tickets and the shoes would go out from the warehouse together to the retail stores. We think that during all of these rush seasons, the taggers devoted not only a substantial part of their work, but all of their work to interstate operations of the defendant. We think these activities were not only "related to goods whose movement in the channels of interstate commerce" has been established, Walling v. Jacksonville Paper Company, 317 U.S. 564, 572, 63 S.Ct. 332, 337, 87 L.Ed. 460, 468 (1943), but were "actually in or so closely related to the movement of the commerce as to be a part of it." McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538, 1543 (1943).
 The defendant, under its appeal, contends that because of what it refers to as the retail-type nature of the work, the work of the taggers was not covered, even in the weeks when they tagged the shoes, much less in the rush weeks when they did not actually handle the shoes. We disagree with defendant's contentions as to both periods. With respect to those weeks when the shoes were actually tagged, see Mitchell v. Sunshine Department Stores, Inc., 292 F.2d 645 (5th Cir. 1961) and Wirtz v. Allied Outlet Stores, Inc., 15 WH Cases 690 (S.D.Ga.1962), rev'd per curiam, 324 F.2d 504 (5th Cir. 1963). The taggers were engaged in commerce also during the weeks of their more limited activity when, because of the rush, they were unable actually to touch the shoes and tag and tie them together, but nonetheless, devoted their full time to the preparation of the tickets, so that they could be inserted into the cases with the shoes and complete with the shoes their interstate journey to the retail stores. The defendant desired and caused these shoes to be tagged en route, in transit. This tagging operation was therefore an en route, in transit, interstate operation. Those who were engaged in the tagging operation were engaged in interstate commerce, those who made the tags as well as those who inserted them into the cases with the shoes. It was essentially one operation. In making the tags, the taggers were transferring to the tags some of the information placed originally on the receiving list. The employee who prepared the receiving list is engaged in commerce. Nunn's Battery & Electric Co. v. Goldberg, 298 F.2d 516, 521 (5th Cir. 1962). Those who inserted the tags into the cases are so engaged. See Mitchell v. Sunshine Department Stores, Inc., supra; Wirtz v. Allied Outlet Stores, Inc., supra. So too, are the taggers who performed the intermediate operation of making the tags.
 We do not approve the District Court's conclusion that the exemption of Section 13(a) (2) of the Act for employees of a retail or service establishment applies to these taggers during the weeks of their more limited activity. Not only was this question of exemption not properly before the Court for determination, defendant not having pleaded the exemption as a defense,[1] but a central office and warehouse of a chain store system do not qualify for the "retail establishment" exemption.[2] Defendant's reliance upon Montgomery Ward & Co. v. Antis, 158 F.2d 948 (6th Cir. 1947) is misplaced. Activities of warehouse employees there considered not covered by the Act, were activities "confined solely to merchandise which, physically or by sample, has already reached the retail stores and such services are rendered in respect to merchandise already sold to retail customers by the retail stores," and services relating to "merchandise received in the warehouse from interstate shipments before it is offered for sale at retail" were considered covered.
 II
 "Nancy Brent, while employed in defendant's office, was engaged in commerce within the meaning of the Fair Labor Standards Act."
 Aside from the fact that the defendant failed to plead a retail establishment exemption for this employee,[3] and aside from the fact that defendant's chain-store central office and warehouse cannot qualify as a retail establishment,[4] we are convinced that the District Court's finding that the plaintiff failed to sustain the burden of proof that this employee devoted a substantial part of her work to the interstate operation of the defendant while employed in the warehouse office is clearly erroneous. This office worker devoted her full time to preparing weekly reports. A "flash report" showed what the retail stores deposited in the bank each day. It was made at the end of each week. One copy was sent to the defendant's certified public accountant in Boston and one to the defendant's office in New York, "so they would have a quick summary of about how much the intake was." Another was a "comparison report" which was "what each store manager makes up — an inventory report each week — and we figured up the retail of what he said he sold, the sales, and compared it with his cash deposit in the bank." This report went also to the certified public accountant. Additionally, for approximately one month, this employee prepared a buyer's report which "figured out what shoes were sold and what style number and told him approximately what he had on hand and how much he would need to buy. It also said what was received during the week and what was needed." This weekly report was for the benefit of defendant's buyer. These activities constituted an essential and integral part of the defendant's interstate activity, entitling this employee to the protection of the Act. See Mitchell v. Kroger Co., 248 F. 2d 935, 938 (8th Cir. 1957); Mitchell v. Sunshine Department Stores, Inc., supra, 292 F.2d at 646; Fleming v. Jacksonville Paper Company, 128 F.2d 395, 398 (5th Cir. 1942); A. H. Phillips, Inc. v. Walling, supra.
 III
 "Defendant failed to sustain its burden of proving each of the conditions necessary to establish that George Addeo and Donald Brent were within the Section 13(a) (1) exemption while employed in the capacity of warehouse manager."
 Section 13(a) (1) exempts from the Acts minimum wage and overtime requirements "any employee employed in a bona fide executive, administrative, or local retailing professional capacity * * *" as such terms are "defined and delimited" by regulations of the Secretary of Labor. The District Court found, in effect, that during the time Addeo and Brent successively occupied the position of manager of defendant's warehouse, they were employed in an "executive" rather than in an "administrative" or "professional" capacity. The appropriate regulation defining and delimiting the term executive capacity[5] states several definitive criteria, all of which must be satisfied if an employee is to be considered exempt. There are listed six such criteria. The two in controversy here are the requirements that the employee "customarily and regularly * * * [exercises] discretionary powers" and that he "not devote more than 20 percent * * * of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d)" of the regulation. The testimony shows that as warehouse manager, these employees performed the duties of directly, or through an assistant, receiving shoes as they arrived at the warehouse, preparing a list of the same and transmitting it to the office. Thereafter, the office directed them as to how to distribute the shoes to the retail stores. These employees supervised the work of other warehouse employees and at times directed the loading of outgoing shoes upon trucks, always following the pattern of last out, first in. Mr. Addeo testified, "My duties were to receive the shoes, break them down, see that they got tagged and distributed." He spent "quite a bit of time" doing the same type work as those whom he supervised, including some of the unloading. In answer to the question "How much time would you devote, then, to actual supervision?", he replied three or four hours a day. Asked then "And would the remainder be routine work such as carrying cases from here to there and unloading?", he replied "Yes." On cross-examination when asked "Then you really supervised them (employees) all day, did you?", he replied, "Yes, sir." Mr. Brent's testimony was substantially the same and specifically that his type of work was "warehouse supervisor" and when asked, "Did you do the same thing as the other people did?", answered, "I worked like they did, yes — distributed shoes when we got the shoes from the office, and I moved shoes around in the warehouse the same as they did. I helped the girls considerably as far as tag numbers, etc. in the office, price categories, and so on." The fact that these two employees concededly meet four of the six criteria does not justify denying them the benefits of the Act. They must meet all of the eight standards. Walling v. General Industries Co., 330 U.S. 545, 67 S.Ct. 883, 91 L.Ed. 1088 (1947); Rothman v. Publicker Industries, 201 F.2d 618 (3rd Cir. 1953); Spring v. Washington Glass Company, 153 F.Supp. 312, 316 (D.C.Penn. 1957). Moreover, the burden rests upon the defendant to prove that they meet all the standards. Walling v. General Industries Company, supra; Rothman v. Publicker Industries, Inc., supra; O'Meara-Sterling v. Mitchell, 299 F.2d 401 (5th Cir. 1962). The mere fact that each of these two employees had as his primary duty the management of the warehouse, does not entitle the employer to exemption. That fact meets only condition (a). Likewise, the fact that he customarily and regularly directs the work of two or more other employees satisfies only condition (b). Rothman v. Publicker Industries, supra. This would be true as to any other condition met. We conclude that the defendant failed to meet its burden of showing that these warehouse managers consistently and regularly exercised discretionary powers and failed also to meet its burden of showing that they did not devote more than 20 percent of their hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of the regulation. The District Court erred in concluding that they were exempt.
 There remain two additional contentions advanced by the defendant under its appeal. First, that the Section 13(b) (1) exemption was available for all the male employees; and second, that the District Court erred in declining to dismiss the claim filed on behalf of one employee, Marie MacDonald, after she sought to withdraw the request to sue previously filed with the Secretary under Section 16(c) of the Act.
 The claim to the Section 13 (b) (1)[6] exemption rests, in part, upon the warehousemen's participation in the loading of the delivery trucks. Except as to the warehouse managers and assistant manager, there was a complete lack of proof that these employees "shared in the exercise of discretion as to the manner in which the loading was done" and as to them, the exemption was properly denied. See Foremost Dairies, Inc. v. Ivey, 204 F.2d 186, 190 (5th Cir. 1953); Pyramid Motor Freight Corporation v. Ispass, 330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184 (1947). Whatever discretion was exercised in the loading of the trucks was exercised by the warehouse managers and assistant manager and this discretion was minimal because the pattern was simply to follow the rule of last out, first in. This operation, at most, only incidentally, and not substantially, related to the safety of vehicles in interstate commerce. This is clearly so in view of the light weight of the cargo involved. As to this activity, the District Court was correct in concluding that it was not of a safety-affecting character. Yellow Transit Freight Lines, Inc. v. Balven, 320 F.2d 495, 499 (8th Cir. 1963). The claim to this exemption rests further upon the occasional participation of some of the warehousemen in such functions as driving or helping on defendant's trucks. The District Court allowed this exemption to one employee who drove as often as two or three times a week.[7] With respect to the other claimants, it found that these activities were a negligible part of their duties and were not of a safety-affecting character, and concluded that these activities constituted so trivial, casual and occasional part of these employees' employment as to remain without the jurisdiction of the Commission. We agree. See Pyramid Motor Freight Corporation v. Ispass, supra. The defendant's reliance upon Morris v. McComb, 332 U.S. 422, 423, 433, 68 S.Ct. 131, 132, 136, 92 L.Ed. 44 (1947) is not overlooked, but there the Court was dealing with "drivers and mechanics employed full time, as such," with "full time" drivers whose "trips were thus a natural, integral and apparently inseparable part of the common carrier service of the petitioner and of his drivers." Here, we are dealing with four employees who occasionally rode the truck with the driver to the retail stores, and there helped unload the shoes,[8] and with three employees who occasionally, and not as a part of their regular duties, drove a truck.[9] The primary jobs of these employees who sporadically helped on the trucks or acted as drivers did not include such work, and these infrequent activities on their part come within the de minimis rule set down by the Supreme Court in Pyramid Motor Freight Corporation v. Ispass, supra. See also Opelika Royal Crown Bottling Company v. Goldberg, 299 F.2d 37, 42 (5th Cir. 1962).
 The remaining inquiry is whether after an employee in writing requests the Secretary to file pursuant to Section 16(c) of the Act a suit against the employer for the recovery of amounts claimed to be due the employee under the Act, and after the Secretary complies with such request by filing the suit, the employee then has power to cause the dismissal of the suit without the consent of the Secretary. While this precise question appears to be new for appellate courts, the district courts have come close to it and at least one has decided it. They have held that in this type suit the employer cannot counterclaim for amounts due by the employee to the employer, Mitchell v. Richey, 164 F. Supp. 419 (D.C.S.C.1958); Mitchell v. Floyd Pappin & Son, Inc., 122 F. Supp. 755 (D.C.Mont.1954); and that the employee's name does not have to be added as a party plaintiff, Mitchell v. Stewart Bros. Construction Co., 184 F. Supp. 886, 898 (D.C.Nebr.1960). In Goldberg v. Merchants & Farmers Radio Station WMSN, Inc., 46 Lab. cases (CCH) ¶ 31, 352 (E.D.N.C.1962) it was held that once suit has been filed on the basis of the written request of an employee "jurisdiction has attached * * * [and] suit therefore may properly be maintained by the Government in his behalf" even though such request is subsequently withdrawn, and in Mitchell v. Stewart Bros. Construction Co., supra, while it was apparently not necessary to the decision, the court stated that the employee "has no power to dismiss the case" and "has no control over the suit."
 A somewhat similar question has been decided under the National Labor Relations Act. The National Labor Relations Board — like the Secretary of Labor under Section 16(c) of the Fair Labor Standards Act — may not initiate proceedings on its own motion, but must await the filing of a private charge that an unfair labor practice has been committed. Once such a charge is filed and the Board has issued and served a complaint, neither the subsequent withdrawal of the charge nor the conclusion of a settlement between the complaining party and the respondent can divest the Board of its discretion to determine whether in the public interest it should abandon or continue the proceedings. N. L. R. B. v. United Packinghouse Workers of America, AFL-CIO, 274 F.2d 816 (5th Cir. 1960).
 This court has recognized that in this type suit brought by the Secretary, the Government becomes an active protagonist for the double purpose of protecting private interests and vindicating public rights. Mitchell v. Mitchell Truck Line, Inc., 286 F.2d 721, 727 (5th Cir. 1961).
 Significantly, Section 16(c) provides, in effect, that where the employee consents to the bringing of the action by the Secretary, the employee thereby waives any right of action he may have under Section 16(b), unless the Secretary's suit is dismissed without prejudice "on motion of the Secretary." Significantly, also, the section speaks of "sums thus recovered by the Secretary" and requires their retention in a special deposit account until disbursed "on order of the Secretary."
 We conclude that the Secretary's standing to prosecute this action on behalf of Marie MacDonald was not dependent upon the non-revocation of her written request pursuant to which the suit was filed, and we affirm the District Court's refusal to dismiss the action as to her.
 We reverse as to the appeal by the Secretary of Labor, affirm as to the appeal by C & P Shoe Corporation, and remand for further and not inconsistent proceedings.
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 See Rules 8(c) and 12(h), Fed.R.Civ.P.; Beechwood Lumber Company v. Tobin, 199 F.2d 878, 881 (5th Cir. 1952); Sams v. Beckworth, 261 F.2d 889, 891 (5th Cir. 1958); Schmidtke v. Conesa, 141 F. 2d 634 (1st Cir. 1944); Carter v. Powell, 104 F.2d 428, 430 (5th Cir. 1939)
 
 
 [2]
 A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095, 1099 (1945); Mitchell v. Sunshine Department Stores, Inc., 292 F.2d 645, 647 (5th Cir. 1961)
 
 
 [3]
 See footnote 1
 
 
 [4]
 See footnote 2
 
 
 [5]
 "The term `employee employed in a bona fide executive * * * capacity' in section 13(a) (1) of the act shall mean any employee:
 (a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and
 (b) Who customarily and regularly directs the work of two or more other employees therein; and
 (c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and
 (d) Who customarily and regularly exercises discretionary powers; and
 (e) Who does not devote more than 20 percent * * * of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section * * *; and
 (f) Who is compensated for his services on a salary basis at a rate of not less than $80 per week * * *." 29 C.F.R. § 541.1.
 
 
 [6]
 "(b) The provisions of section 7 shall not apply with respect to —
 (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935;"
 
 
 [7]
 No complaint is made as to that ruling
 
 
 [8]
 It is claimed that these employees are exempt as helpers. One testified that he acted as a helper twice during his employment of nearly two years; another testified that he acted as a helper one-half of the Saturdays he worked between January 6, 1957, and March 9, 1957; another testified that he helped "for a little while, about once every other week," and the fourth testified merely that he helped
 
 
 [9]
 One employee said he drove once or twice a month, another had driven three times in approximately two years, and the third made the trip about "twice or so" while the regular driver was out of the state because of family trouble