Daniel HARRELL, James Leach, and L.C. Nix, Plaintiffs,

Wren Smitherman, et al., Plaintiffs–Intervenors,

v.

UNIVERSITY OF MONTEVALLO, et al., Defendants.

Civ. A. No. 86–C–1637–S.

United States District Court, N.D. Alabama, S.D.

Sept. 30, 1987.

Joe R. Whatley, Jr., Lisa Huggins, Falk-
enberry, Whatley & Heidt, Birmingham,
Ala., for plaintiffs.

Carl E. Johnson, J. Scott Greene, Bishop,
Colvin & Johnson, Birmingham, Ala., for
defendants.

## FINDINGS OF FACT AND CONCLU-
SIONS OF LAW ON RACIAL
DISCRIMINATION CLAIMS

CLEMON, District Judge.

In this aspect of the case, plaintiffs
Katherine Bell, Ida S. White, Arlinda Tripp,
Loretta Tate, Dorthola Nicks, Willie
McCary, Minnie Brazzell, Curlie S. Moore,
L.C. Nix and Gregory Cox claim that they
were terminated from their employment
with the defendant University of Monteval-
lo because of their race.[1] The claims are
asserted under both 42 U.S.C. Section
2000e *et seq.* ("Title VII") and 42 U.S.C.
Sections 1981, 1983. It is conceded that
plaintiffs have exhausted their remedies

1. The other aspect of the case involves claims of
age discrimination by all of the plaintiffs except
Gregory Cox.

under Title VII, and that the Court has jurisdiction over the claims.

Based on the Agreed Facts, and the evidence adduced at trial, the Court makes and enters the following Findings of Fact and Conclusions of Law.[2]

### I. THE *PRIMA FACIE* CASE

1. Plaintiffs Ida S. White, Arlinda Tripp, Minnie Brazzell, and Gregory Cox are black adult citizens of both the United States and the State of Alabama. White, Tripp, and Brazzell were employed by the University of Montevallo ("the University") as custodians; Cox was employed as a carpenter.

2. The University is a public University of the State of Alabama. Defendant James F. Vickrey, Jr., is president of the University; defendant Sherrill White is its Director of Physical Plant Department; and defendant Hale S. Skelton was the head of its Custodial Division at the times material to this action. All of the individual defendants are white; and they are sued under 42

U.S.C. Sections 1981 and 1983 in their individual as well as official capacities.

3. For the 1986–87 academic year, funds appropriated to the University of Montevallo, coupled with the Governor of Alabama announced proration of all education budgets, resulted in reduced state funding to the University of approximately 1.6 million dollars. As a result of the reduced appropriations from the State of Alabama, and upon the recommendation of President Vickrey, the Board of Trustees of the University declared a state of financial emergency.

In response to the declared financial emergency, President Vickrey, set a priority on reducing budgets in all non-academic areas and departments at the University and specifically charged the Physical Plant Department with reducing its overall budget by up to 20%.

4. In early May, 1986, Sherrill White made the following recommendation to President Vickrey:

I. REORGANIZATION OF FACILITIES MAINTENANCE
    A. Custodial Reorganization
        1. Reduction from 41 employees to 30 employees
        2. All retirees in June 1986 will be replaced
            a. Mrs. Harris with new Flowerhill maid.
            . . .
            e. Twelve (12) Custodial personnel will be given notices of termination on 6–1–86 to be effective 9–1–86 because of the reorganization of Custodial Services.
            f. All future retirees (after June 30, 1986) will be replaced.
Labor Savings (12) employees      $110,255.92
    B. REORGANIZATION OF CARPENTER SHOP
        . . .
        2. Reduction one one skilled carpenter
        . . .
Labor Savings (3) employees      $35,127.04

President Vickrey approved the recommendation.

5. Sherrill White's recommendation was based, in turn, on a recommendation to him

from Skelton. Skelton viewed the declared financial crisis at the University as an opportunity to terminate certain employees. Prior to the time that the employees in his

---

**2.** Six of the plaintiffs (Katherine Bell, Loretta Tate, Dorthola Nicks, Willie McCary, Curlie S. Moore, and L.C. Nix) have prevailed on their claims under the Age Discrimination in Employ- ment Act ("ADEA"), 29 U.S.C. Section 621 *et seq.* Since they are not entitled to a double recovery, there is no occasion to consider their claim in this aspect of the case.

division were evaluated in late May 1986, he had already decided which employees would be terminated.

6. Prior to 1986, employees in the Custodial Division had been laid off based on their seniority.

7. Prior to 1986, the supervisor of the custodial workers, Fannie Booth, personally evaluated each custodial worker annually. Mrs. Booth is white. In the evaluations of late May, 1986, the evaluations were largely done by the crew leaders, under Skelton's directions.

8. Although Booth was the supervisor of all the custodial workers, she was not consulted and did not participate in the selection of custodial workers to be terminated.

9. By letter dated June 1, 1986, each of the plaintiffs was informed that he or she was being terminated from employment with the University, effective the end of August, 1986.

10. As of June 1, 1986, there were 30 custodial workers actually working at the University, 22 of whom were black and 17 of whom were white.

11. The notices of June 1, 1986, terminated nine black custodial workers and two white custodial workers who were actually working at the University, retaining thirteen blacks and fifteen whites.

12. As of June 1, 1986, the University employed one carpentry foreman, and five carpenters with plaintiff Cox being the only black, and plaintiff Cox was the only one of these terminated.

13. The following tables show statistics before and after the terminations:

**Employees Working as of June 1, 1986**

|  | Custodians | Carpenters | Total |
| --- | --- | --- | --- |
| Blacks | 22 | 1 | 23 |
| Whites | 17 | 5 | 22 |
| Total | 39 | 6 | 45 |

**Employees Terminated Who Were Working June 1, 1986**

|  | Custodians | Carpenters | Total |
| --- | --- | --- | --- |
| Blacks | 9 | 1 | 10 |
| Whites | 2 | 0 | 2 |
| Total | 11 | 1 | 12 |

**Employees Retained After September 1, 1986**

|  | Custodians | Carpenters | Total |
| --- | --- | --- | --- |
| Blacks | 13 | 0 | 13 |
| Whites | 15 | 5 | 20 |
| Total | 28 | 5 | 33 |

14. The probability that the above described racial disparities in the statistics resulted from chance is extremely small—only one out of 100 times.

15. The above statistics are 2.32 standard deviations from the norm.

16. By memo dated June 12, 1986, the University's Equal Employment Officer ("EEO") informed President Vickrey that the above described "statistics by themselves could 'raise a red flag' [with respect to racial discrimination] and necessitate a further look the situation." The EEO had previously informed Sherrill, White and Skelton of the same matter. After being so informed, none of the individual defendants changed any of their decisions as to who would be terminated or retained as custodial workers or carpenters at the University.

17. The criteria which defendants used in deciding which custodial workers and carpenters to terminate and which to retain were largely subjective.

18. Between May 1, 1986 and May 1, 1987, the University hired at least two white females in full-time custodial positions. Carolyn McGee, white, was hired on June 16, 1986, as a custodian. She worked until May 16, 1987, the date she resigned after her performance was evaluated as "Definitely Unsatisfactory" and it was rec-

ommended that she not be given permanent status. Frances Partridge, another white female, was hired on December 12, 1986. She has worked on a full-time basis since that time.

19. Each of the plaintiffs was qualified for the position which he or she held prior to the terminations.

20. Whites were retained in positions comparable to the plaintiffs at the time of their terminations.

21. Plaintiffs have carried their burden of establishing a prima facie case that they were terminated because of their race or color.

## II. THE ARTICULATED REASON

22. Defendants say that the decision to terminate the plaintiffs was based on a need to reduce the number of employees in the department where plaintiffs work, and that the job performance of the plaintiffs, when compared to that of the employees who were retained, was less satisfactory.

## III. THE CREDENCE OF THE ARTICULATED REASONS

23. The credible testimony indicates that Cox's job performance was less satisfactory than the other skilled carpenters. A review of his personnel file reflects that on March 24, 1984, Cox was warned concerning "[e]xcessive absenteeism and quality of work." The warning concluded: "... the above actions must be corrected immediately or your job will be terminated."

24. In January–February, 1986, Cox was again warned for excessive absenteeism, without a doctor's excuse. Again in March, Cox was reprimanded for absenteeism.

25. The Court has carefully reviewed the personnel files of all the white carpenters, and they contain no evidence that any of them have had job-related problems as serious as those of Cox.

26. There is no credible evidence that the University's decision to reduce the number of skilled carpenters was racially motivated.

27. Gregory Cox has failed to establish that the articulated reason for his discharge is either unworthy of credence or a pretext for racial discrimination.

28. Although the University's stated goal was to reduce the number of custodians by twelve; in fact, the contracts of fourteen custodians were not renewed.

29. Within three weeks of the time that Ida White, Tripp, and Brazzell received notices of termination, the University hired a white female in a fulltime custodial position. This position was not offered to either of these plaintiffs.

30. The defendants' after-the-fact "Square Footage–Performance Comparison" chart (DX 41) is unworthy of credence insofar as it suggests that the quantitative performance of plaintiffs was below that of the retained employees.

31. The defendants' "Absenteeism/Sick Leave" charts (DX 39, 40) are likewise unworthy of credence insofar as they suggest that plaintiffs' attendance at work, or lack of it, adversely affected their performance. For all that appears, all of the absences reflected thereon were excused absences; and there is no credible evidence that these excused absences had any impact on the overall ability of the Custodial Department to fulfill its mission. Moreover, the 1986 evaluations of Ida White and Minnie Brazzell reflect that their attendance was "More Than Satisfactory." Arlinda Tripp's evaluation for the same year shows that her attendance was "Satisfactory." The Court credits the evaluations on the issue of attendance.

32. The May 1986 evaluations are, at best, suspect. Skelton knew, prior to the evaluations, that they would be used in defending his recommendation to terminate certain custodians and to retain others. For the first time, employees had no input in their evaluations. Moreover, the supervisor of the custodians was not permitted to evaluate all the custodians, as she had done in the past. Instead, Skelton principally delegated this task to the crew lead-

ers; and Booth only evaluated three employees.

33. Minnie Brazzell was evaluated in 1986 by white crew leader Helen Fore. She was rated "Satisfactory" in all of the areas shown on the evaluation form except for "Attendance" (where she rated "More Than Satisfactory") and "Physical Fitness," (where she was evaluated as "Unsatisfactory"). In 1985, Booth's overall rating of Brazzell was "More Than Satisfactory." Her "Physical Fitness" in that year was evaluated as "Satisfactory." Booth rated Brazzell "Outstanding" in 1984, when she received the highest possible rating in nine out of ten categories. The defendants conceded at trial that they felt that Brazzell is physically able to do her job.

34. Both Ida White and Tripp were evaluated by a black crew leader, Birdia Chapple. Chapple herself was rated "Satisfactory" in 13 out of 15 areas; her Physical Fitness "Need[ed] Improvement", and her "Courtesy" was "More Than Satisfactory."

35. Chapple's overall evaluation of Ida White in 1986 was "Satisfactory," in all areas except "Alertness", where she was rated as "More Than Satisfactory." In the preceding year, White had been rated by Booth as "More Than Satisfactory" in 7 out of the 15 areas, and as "Outstanding" in another area. In the remaining seven areas, her evaluation was "Satisfactory." The 1984 overall evaluation of Ida White by Booth was "More Than Satisfactory."

36. Tripp was also evaluated by Chapple in 1986. In all areas, she received at least a "Satisfactory" rating; and in four of them, she was rated "More Than Satisfactory." In her two preceding evaluations by Booth, her overall ratings were "More Than Satisfactory."

37. Leona White, one of the retained employees, was evaluated in 1986 as "Need[ing] Improvement" in both Physical Fitness and Creativity. She was "More Than Satisfactory" in three areas; and "Satisfactory" in all other areas.

38. Skelton personally approved of the crew leaders' evaluations of Ida White, Tripp, Brazzell, as indicated by his initials over the signature of the crew leader on the evaluation forms.

39. Skelton caused Ida White, Tripp, and Brazzell to be evaluated by Chapple as "Satisfactory", rather than "More Than Satisfactory" as a pretext for racial discrimination.

40. In late May, 1986, at the behest of Skelton, ten of the eleven white custodians were evaluated as "More Than Satisfactory", while thirteen of the twenty black custodians were evaluated as "Satisfactory" or less.

41. Ida S. White, Arlinda Tripp, and Minnie Brazzell have carried their burden of establishing that the reason articulated by the defendants is, in some respects, unworthy of credence, and in the other respects, a pretext for racial discrimination.

42. Ida S. White, Arlinda Tripp, and Minnie Brazzell have convinced the Court, by a preponderance of the evidence, that they were terminated by the defendants because of their race.

### IV. DAMAGES

43. Ida S. White has lost earnings in the amount of $9,325.28, as a result of her unlawful termination by the defendants.

44. Arlinda Tripp has lost earnings in the amount of $10,108.80 as a result of her unlawful termination by the defendants.

45. Minnie Brazzell has lost earnings in the amount of $10,108.80 as a result of her unlawful termination by the defendants.

46. Ida S. White, Arlinda Tripp, and Minnie Brazzell are entitled to injunctive relief, which shall be granted by separate order.

### MEMORANDUM OF OPINION ON THE MT. HEALTHY DEFENSE AND LIQUIDATED DAMAGES

In this case under the Age Discrimination in Employment Act ("ADEA"), 29 U.S. C. Section 621(b), the jury found that the age(s) of six of the twelve plaintiffs was a determining factor in the decision of the University of Montevallo to discharge them. Although the University had not

pled a defense under *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court submitted the issue to the jury and it found that even if age had not been a factor in the decision, all of the plaintiffs would have been discharged.

The jury also found that the discharge decisions were not "willful", within the meaning of the ADEA. For decision by the Court are two issues: (1) whether the defendants' failure to plead the *Mt. Healthy* defense constitutes a waiver of the defense, and (2) whether the evidence supports the jury's finding that the discharges were not willful.

### I.

■ The *Mt. Healthy* defense permits an employer whose challenged decision was motivated in part by an impermissible consideration to avoid liability if it can show that even in the absence of the impermissible consideration, it would have reached the same decision. It is settled law that the employer bears the burden of proof where this defense is asserted. Two years after the *Mt. Healthy* decision was rendered, our predecessor circuit[3] indicated that the Supreme Court implicitly viewed "... *Mt. Healthy* as establishing the elements of the defendant's 'same decision anyway' *affirmative defense* in cases where a ... decision is attacked as motivated by a[n] ... impermissible purpose." *Wilson v. Thompson*, 593 F.2d 1375, 1386 n. 20 (5th Cir.1979) (emphasis added).

More recently, in *Hidle v. Geneva County Bd. of Educ.*, 792 F.2d 1098 (11th Cir. 1986), the circuit addressed the issue. There, the district court initially found that the employer had failed to hire plaintiff because of her sex. Seven months after rendering judgment, the district court reversed itself, finding that the employer was entitled to prevail on the *Mt. Healthy* defense. In reversing the district court, the circuit pointed out that, among other

things, "[t]he *Mt. Healthy* issue, on the basis of which the trial court reversed itself, *was neither pleaded by the defendant nor referred to in the pretrial order.*" 792 F.2d at 1100 (emphasis added).

If the circuit had viewed *Mt. Healthy* as being implicit in every defense, then, of course, its absence from the pleadings and the pretrial order would be of no moment.

Supreme Court support for the proposition that *Mt. Healthy* is an affirmative defense is also found in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). There the NLRB had held that where an employer's decision to discharge an employee is motivated by both legal and illegal reasons in a discharge case, it may assert as an affirmative defense that it would have acted in the same manner for wholly legitimate reasons and absent the improper motivation. In upholding the Board's allocation of the burden of proof as "clearly reasonable", the Supreme Court cited the *Mt. Healthy* case and pointed out that in such cases

> The employer is a wrongdoer; he has acted out of a motive that is declared illegitimate by the statute. It is fair that he bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing.

462 U.S. at 403, 103 S.Ct. at 2475.

Statutory exemptions under both the Fair Labor Standards Act and 42 U.S.C. Section 2000e *et seq.* ("Title VII") have been held to be affirmative defenses.[4] *Wirtz v. C & P Shoe Corp.*, 336 F.2d 21, 26, n. 1 (5th Cir.1971); *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). As an equitable matter, an employer entitled to a statutory exemption from the operation of these laws is surely on sounder footing

---

3. The law of the "old" Fifth Circuit is the law of the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir.1981).

4. In point of fact, the Supreme Court refers to the five statutory exemptions of the ADEA as "... the ADEA's five affirmative defenses." *TWA v. Thurston*, 469 U.S. 111, 122, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985).

than one who is judicially permitted "... to avoid liability even though his illegal motive was a substantial factor in causing injury...." *Spanier v. Morrison's Management Services, Inc.*, 822 F.2d 975, 980, n. 5 (11th Cir.1987). As our circuit has noted, "... *Mt. Healthy* provides a defense that has no analogue in the law of torts." *Id.*

Unless *Mt. Healthy* is construed as an affirmative defense, a plaintiff in an ADEA case would be required unreasonably to speculate whether a defendant intended to assert it and the plaintiff could well be unfairly surprised at trial. See *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1013 (11th Cir.1982), for a discussion of similar considerations underlying the requirement that the Section 703(h) ("bona fide seniority system") exemption of Title VII be pled as an affirmative defense. "It is possible that a defendant might decide as a tactical matter to forego a *Mt. Healthy* defense." [5] *Spanier*, 980, n. 4.

The University of Montevallo has not directed the Court's attention to a single case in this circuit or elsewhere for the proposition that *Mt. Healthy* is not an affirmative defense.

■ Upon consideration of the authorities, the Court concludes that the *Mt. Healthy* defense is an affirmative defense; and that by having failed to plead it or to assert it at anytime prior to the time that the parties had rested at the close of the

evidence, the University of Montevallo waived the defense.[6]

## II.

■ A reasonable jury is compelled by the undisputed evidence to the conclusion that the decisionmakers at the University of Montevallo knew that it is unlawful to discharge employees because of their age. The jury found that age was a determining factor in the decision to discharge six of the plaintiffs.

In reaching its finding that the age factor motivated the university, the jury apparently credited the testimony of several witnesses that the decisionmakers clearly made it known that older workers would be "laid off" ahead of younger ones. The head of the Custodial/Housekeeping Department, Fannie Booth, testified that her supervisor, the Coordinator of Facilities Maintenance, told her that as the older employees "got of age", he would prefer that they retire. For that reason, she retired at age 62. Although she was the head of the department, she testified that she did not recommend the employees would be terminated. The supervisor who was pivotal in the challenged decisions, Hale Skelton, testified that as of September 1, 1986, after the terminations were effected, each of the custodial workers over the age of 62 had either resigned or had been terminated; and all of the custodial workers under 49 had been retained.

---

**5.** The University of Montevallo's brief asserts that "... the firmly established place of the *Mt. Healthy* doctrine as an implicit and integral part of virtually every defendant's rebuttal case strongly militates against any lately asserted claim of surprise...." Brief, pp. 4–5. The court's experience is that in the majority of the ADEA cases tried before it, the *Mt. Healthy* defense is never raised, presumably because of defense counsel's unwillingness to concede, even in the alternative, that an illegal motive may have influenced the decision.

**6.** The University of Montevallo argues that plaintiffs cannot claim surprise by its failure to plead *Mt. Healthy* because (1) plaintiffs' counsel referred to "direct evidence which shifts the burden of proof to defendant" during the court's opening instructions, and (2) plaintiffs' counsel requested instructions concerning the *Mt.*

*Healthy* defense. The argument lacks foundation. Counsel's comment during opening instructions and his Requested Instruction 19 assumed that the Court would charge the jury to analyze the evidence according to the scheme outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court did not so charge, for the reasons discussed in *Spanier*, at 980.

Montevallo's counsel did not refer to the *Mt. Healthy* defense during his opening statement, after having failed to raise it prior to that time. Therefore, plaintiffs opened and closed their evidence on the assumption that the university's sole defense was that it had not discharged them because of their age. That assumption being amply supported by everything that had transpired in the case up to that point, it would be manifestly unjust to permit the University to prevail based on a hitherto undisclosed defense.

**438**

The jury's finding that age was a motivating factor in the decision to discharge six of the plaintiffs is inconsistent with its finding that the discharge decisions were not willful. For if the jury is correct that age was a motivating factor, then the University must have intended to discharge the plaintiffs because of their ages, notwithstanding its knowledge that the ADEA forbids such actions. This is not a disparate impact case such as that in *Thurston, supra;* instead this rather common ADEA case involves an employer whose discrete personnel actions are directed at specific employees.

Under the evidence in this case, in the light and with all reasonable inference most favorable to the University, reasonable and fair-minded jurors in the exercise of impartial judgment could not find that the University's action was not willful. Therefore, the jury's finding on this issue is due to be set aside.

Based on the reasons discussed herein, plaintiffs L.C. NIX, KATHERINE BELL, CURLEE MOORE, DORTHOLA NICKS, and LORETTA TATE shall be ORDERED REINSTATED in their employment by the University of Montevallo, and they are entitled to liquidated damages.

### FINAL JUDGMENT AND PERMANENT INJUNCTION

Based on the jury's answer to Question 1 of the Special Verdict, the accompanying Memorandum of Opinion on the *Mt. Healthy* Defense and Liquidated Damages, the Agreed Facts, and the accompanying Findings of Fact and Conclusions of Law on Racial Discrimination Claims, it is hereby ORDERED, ADJUDGED, DECLARED, and DECREED as follows:

1. The defendants UNIVERSITY OF MONTEVALLO, its officers, agents, servants, employees, and those in active concert or participation with them who receive actual notice of this order are hereby PERMANENTLY ENJOINED from discriminating against plaintiffs L.C. NIX, KATHERINE BELL, WILLIE McCARY, CURLIE MOORE, DORTHOLA NICKS, and LORETTA TATE because of their age.

2. The defendant UNIVERSITY OF MONTEVALLO shall reinstate L.C. NIX, KATHERINE BELL, WILLIE McCARY, CURLIE MOORE, DORTHOLA NICKS, and LORETTA TATE to their former positions, with all accrued benefits, as of October 5, 1987; or, in lieu thereof, pay over to said plaintiffs the salaries they would earn had they been so reinstated, commencing with the next pay period after October 5, 1987.

3. On their claims of age discrimination, the following plaintiffs shall have and recover of defendant UNIVERSITY OF MONTEVALLO the amounts indicated:

| | Backpay | Prejudgment Interest | Liquidated Damages and Total |
|---|---|---|---|
| L. C. Nix | $ 2,523.20 | $113.54 | $ 5,273.48 |
| Katherine Bell | 10,108.80 | 462.89 | 21,143.38 |
| Willie McCary | 7,681.74 | 345.68 | 16,054.84 |
| Curlie Moore | 9,443.20 | 424.94 | 19,736.28 |
| Dorthola Nicks | 4,947.20 | 222.62 | 10,339.64 |
| Loretta Tate | 7,126.24 | 120.68 | 14,493.84 |

4. The defendant UNIVERSITY OF MONTEVALLO, its officers, agents, servants, employees, and those in active concert or participation with them who receive actual notice of this order are hereby PERMANENTLY ENJOINED from discriminating against plaintiffs IDA S. WHITE, ARLINDA TRIPP, and MINNIE BRAZZELL because of their race or color.

5. The defendant UNIVERSITY OF MONTEVALLO shall reinstate plaintiffs IDA S. WHITE, ARLINDA TRIPP, and MINNIE BRAZZELL to their former positions, with all accrued benefits, as of Octo-

ber 5, 1987; or, in lieu thereof, pay over to said plaintiffs the salaries they would earned had they been so reinstated, commencing with the next pay period after October 5, 1987.

6. On their claims of racial discrimination, the following plaintiffs shall have and recover of the UNIVERSITY OF MONTEVALLO the amounts indicated:

|  | Backpay | Prejudgment Interest | Total |
|---|---|---|---|
| Ida S. White | $ 9,325.28 | $559.52 | $ 9,884.80 |
| Arlinda Tripp | 10,108.80 | 606.53 | 10,715.33 |
| Minnie Brazzell | 10,108.80 | 606.53 | 10,715.33 |

7. Plaintiffs L.C. NIX, KATHERINE BELL, WILLIE McCARY, CURLIE MOORE, DORTHOLA NICKS, LORETTA TATE, IDA S. WHITE, ARLINDA TRIPP, and MINNIE BRAZZELL shall have and recover of defendant UNIVERSITY OF MONTEVALLO a reasonable attorney's fee and reimbursement of expenses, to be hereafter fixed by the Court in the absence of an agreement between the parties. Not later than October 5, 1987, plaintiffs' counsel shall file with the Court and serve on defendants' counsel an itemized statement of his hours expended, services rendered, and expenses incurred. The Court thereafter will set down the matter for hearing.

8. Plaintiffs REV. DANIEL HARRELL, JAMES LEACH, WREN SMITHERMAN, and GREGORY COX shall have and recover NOTHING of the defendants.

9. The costs of this action are hereby taxed against defendants, for which execution shall issue.