# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 13, 2014

No. 12-20194

Lyle W. Cayce
Clerk

DONALD ALLEN; JAVIER BAUTISTA; ADAM D. CREWS, SR.; ODELL GODFREY; JEROME JOHNSON; ET AL,

Plaintiffs - Appellants

v.

COIL TUBING SERVICES, L.L.C.

Defendant - Appellee

------------------------------------------------------------------------------------------------------------

JOSHUA BABINEAUX; DAVID BARRAS; ROSS WAYNE BOUTTE, WILLIAM C. BROUSSARD; WILLIAM DANIEL BROWN, ET. AL.,

Plaintiffs - Appellants

v.

COIL TUBING SERVICES, L.L.C.

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, DENNIS and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

No. 12-20194

Plaintiffs-Appellants alleged that they worked more than forty hours a week, and that their employer, Defendant-Appellee Coil Tubing Services, L.L.C. ("CTS"), wrongfully denied them overtime pay in violation of the Fair Labor Standards Act ("FLSA"). The district court held, among other things, that the Motor Carrier Act ("MCA") exempted certain CTS employees from the overtime-pay requirements of the FLSA based, in part, on the percentage of safety-affecting interstate activities these employees engaged in company-wide. Undertaking a limited interlocutory review, we AFFIRM.

## FACTS AND PROCEEDINGS

CTS services oil wells. From 2005 to 2008, the company divided itself into six geographic "districts." The districts operated under a single U.S. Department of Transportation ("DOT") number, and were not legal entities distinct from CTS. The districts sometimes borrowed personnel and equipment from each other. They also sometimes solicited and accepted projects outside their respective geographic boundaries.

Plaintiffs worked in four of the districts: Alice, Texas; Angleton, Texas; Bridgeport, Texas; and Broussard, Louisiana. Their positions included: Equipment Operator ("EO"), Service Technician I ("ST-I"), Service Technician II ("ST-II"), Service Supervisor Trainee ("SST"), Service Supervisor ("SS"), Service Coordinator ("SC"), and Field Engineer I ("FE-I").

Plaintiffs' duties varied by position. SCs coordinated projects. FE-Is recorded the pressure of coil tubing units at well sites. EOs, ST-Is, ST-IIs, SSTs, and SSs helped transport materials to project sites.

Plaintiffs initiated this suit for overtime pay in November 2008. "To efficiently manage [the] case," the district court ordered the parties to conduct discovery on a cross-section of fourteen Plaintiffs, known as the "Bellwether group." On completion of discovery, the parties filed cross-motions for summary judgment on whether exemptions to the FLSA, and, in particular, an MCA

2

exemption allowing certain employers not to pay overtime to employees engaged in safety-affecting interstate activities, applied to Plaintiffs.

The district court initially denied, in part, summary judgment for CTS based, in part, on a district-by-district analysis of the employees' interstate activities. The district court explained: that EOs, ST-Is, ST-IIs, SSTs, and SSs, but not FE-Is and SCs,[1] had similar-enough job duties to be grouped together as "Field Service Employees," or "FSEs"; that FSEs who worked on land-based, but not offshore, wells engaged in activities affecting motor vehicle safety; and that, measuring interstate activities by district, only land-based FSEs in certain districts had a reasonable expectation of engaging in sufficient interstate activities.

The parties filed motions for reconsideration. Observing that "[n]either party had argued for a district-by-district analysis," the district court granted CTS' motion, and vacated its initial order.

The district court then granted, in part, summary judgment for CTS, using a company-wide analysis to find that the MCA exemption applied to many of the Plaintiffs. In a sixty-three page opinion issued January 11, 2012, the district court used the same individualized analysis to establish the class of FSEs, and to determine that only FSEs who worked on land-based wells engaged in activities affecting motor vehicle safety. The district court then reasoned that a company-wide analysis of these employees' interstate activities was appropriate because "[t]here is insufficient evidence or legal authority . . . to treat the districts separately." Measuring the interstate activities of land-based FSEs on a company-wide basis, the district court found: that 7 percent of projects required these employees to drive across state lines; that such trips were

---

[1] The district court denied the parties' summary judgment motions relating to the FE-Is and SCs on the basis that there was a genuine issue of fact as to whether the MCA exemption applied to employees holding these positions.

No. 12-20194

assigned indiscriminately; and that, therefore, land-based FSEs had a "reasonable expectation" that they "could be assigned to drive interstate." The district court extended its rulings to all Plaintiffs, and not just those in the Bellwether group.

The district court granted Plaintiffs' request for permission to file an interlocutory appeal under 29 U.S.C. §1292(b), explaining that its rulings, "particularly those involving application of the [MCA exemption], involve controlling questions of law as to which there is substantial ground for difference of option," and that "an immediate appeal from those rulings is likely to materially advance the ultimate termination of this litigation." This court then granted Appellants' motion for leave to appeal.

## STANDARD OF REVIEW

"Although we ordinarily review a district court's summary judgment ruling *de novo*, our appellate jurisdiction under [28 U.S.C.] § 1292(b) extends only to controlling questions of law, thus, we review only the issue of law certified for appeal." *Tanks v. Lockheed Martin Corp.*, 417 F.3d 456, 461 (5th Cir. 2005). The district court certified for interlocutory appeal the rulings in its January 11, 2012 order, "particularly those involving application of the [MCA exemption]." We therefore limit our review to these rulings, particularly whether the MCA exemption applies.

## THE MCA EXEMPTION

Section 207 of the FLSA requires an employer to pay overtime compensation to any employee working more than forty hours in a workweek.[2]

---

[2] Section 207(a)(1) provides in full:

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one

No. 12-20194

*See* 29 U.S.C. § 207(a)(1); *Singer v. City of Waco*, 324 F.3d 813, 818 (5th Cir. 2003). "Exemptions under the FLSA are construed narrowly against the employer, and the employer bears the burden to establish a claimed exemption." *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 471 (5th Cir. 2010).

At issue on appeal is the MCA exemption, "which states that the FLSA's overtime requirement 'shall not apply . . . to . . . any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49' of the MCA." *Id* (alterations in original) (quoting 29 U.S.C. § 213(b)(1)). Section 31502, in turn, provides that the DOT "may prescribe requirements for . . . qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2). The DOT may establish these requirements for employees who

> (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the [MCA] . . . and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA].

29 C.F.R. § 782.2(a); *see Songer*, 618 F.3d at 472. "For the motor carrier exemption to apply . . . [the employees] must meet both of these requirements." *Barefoot v. Mid-Am. Dairymen, Inc.*, No. 93-1684, 1994 WL 57686, at *2 (5th Cir. Feb.18, 1994) (per curiam) (unpublished).

To satisfy the first requirement—whether the employer is "subject to [the DOT's] jurisdiction," 29 C.F.R. § 782.2(a)—an employer "must be engaged in interstate commerce." *Songer*, 618 F.3d at 472. The MCA defines interstate

---

and one-half times the regular rate at which he is employed.

commerce as commerce "between a place in . . . a State and a place in another State." 49 U.S.C. § 13501(1)(A). However, this definition "has not been applied literally by the courts. In fact, we have defined it as the actual transport of goods across state lines or the intrastate transport of goods in the flow of interstate commerce." *Songer*, 618 F.3d at 472 (internal quotation marks omitted).

To satisfy the second requirement—whether the employees "engage in activities of a character directly affecting the safety of operation of motor vehicles . . . in interstate . . . commerce," 29 C.F.R. § 782.2(a)—"neither the name given to his position nor that given to the work that he does is controlling." 29 C.F.R. § 782.2(b)(2) (citing *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 707 (1947)). Rather, "what is controlling is the character of the activities involved in the performance of [the employee's] job." 29 C.F.R. § 782.2(b)(2); *see Levinson v. Spector Motor Serv.*, 330 U.S. 649, 674-75 (1947) (observing that "[i]t is the character of the activities rather than the proportion of either the employee's time or of his activities" that controls). As a "general rule,"

> if the bona fide duties of the job performed by the employee are in fact such that he is (or, in the case of a member of a group of drivers, driver's helpers, loaders, or mechanics employed by a common carrier and engaged in safety-affecting occupations, that he is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities . . . he comes within the exemption in all workweeks when he is employed at such job. . . . Where this is the case, the rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation."

29 C.F.R. § 782.2(b)(3)*; see Songer*, 618 F.3d at 474. "On the other hand, where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial,

casual, and insignificant as to be de minimis, the exemption will not apply to[the employee] in any workweek so long as there is no change in his duties." 29 C.F.R. § 782.2(b)(3) (citing *Pyramid*, 330 U.S. at 707-08).

To measure whether employees are "likely to be . . . called upon in the ordinary course of [their] work to perform . . . safety-affecting activities" that are interstate in nature, 29 C.F.R. § 782.2(b)(3), we look to whether the employees "could reasonably have been expected to [engage] in interstate commerce consistent with their job duties." *Songer*, 618 F.3d at 476 (finding that a reasonable expectation arose when about 2.75 percent of "loads were transported across state lines"); *see Morris v. McComb*, 332 U.S. 422, 433-34 (1947) (applying the MCA exemption to drivers who spent about 4 percent of their time transporting goods in interstate commerce); *Starrett v. Bruce*, 391 F.2d 320, 323-24 (10th Cir. 1968) (applying the MCA exemption to a driver, even though the driver's employer derived no income from interstate transport, because the employer solicited interstate business and would have assigned the driver to interstate trips if the employer had obtained such business).

The parties do not dispute that CTS satisfies the first requirement—being "subject to [the DOT's] jurisdiction," 29 C.F.R. § 782.2(a)— because it is a motor carrier that engages in interstate commerce. Rather, the parties dispute the second requirement: whether the FSEs engaged in activities that affected "the safety of operations of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce." 29 C.F.R. § 782.2(a). Within the framework of this second requirement, the parties do not contest that an individualized analysis is appropriate to determine whether Appellants have similar-enough duties to belong to the class of employees that engages in safety-affecting activities. The parties only contest whether, in measuring the interstate activities of this class of employees, an "employee-by-employee," "district-by-district," or "company-wide" analysis is appropriate.

No. 12-20194

We hold that a company-wide analysis is appropriate in this case because this court's precedent effectively forecloses an employee-by-employee analysis, and the facts of this case, and arguments advanced by the parties, do not support a district-by-district analysis.

This court's *Songer* decision declined to adopt an employee-by-employee analysis. In *Songer*, truck drivers sought overtime under the FLSA. 618 F.3d at 468. The drivers argued that "[s]imply being an interstate driver for a commercial carrier is not enough . . . a driver must be personally engaged in interstate transportation to be exempt." A unanimous panel declined to adopt this argument, observing that the "application of the MCA exemption to an employee 'depends . . . on the *class* of work involved in the employee's job.'" *Songer*, 618 F.3d at 472 (emphasis added) (quoting 29 C.F.R. § 782.2(a)). The panel first observed that "Plaintiffs, as truck drivers subject to DOT requirements, are employed in positions that affect the operational safety of motor vehicles." *Songer*, 618 F.3d at 473 (internal quotation marks omitted). Then, evaluating these drivers as a class, the panel found: that about 2.75 percent of the drivers' trips were interstate; that the drivers' employer indiscriminately assigned such trips; and that, therefore, the drivers "could reasonably have been expected to drive in interstate commerce consistent with their job duties." *See id.* at 475-76. This is *Songer*'s binding analysis:

> Plaintiffs assert that the Secretary's jurisdiction only applies to transportation across state lines, and therefore that Defendants must demonstrate that each driver personally transported property by motor vehicle across state lines. But the Supreme Court held in *Morris* that the Interstate Commerce Commission (ICC), the predecessor to the DOT, had jurisdiction to regulate all of defendant carrier's drivers, even though two of the 42 drivers had not engaged in interstate trips during the relevant period, and that the drivers were not entitled to overtime under the FLSA. *Morris*, 332 U.S. at 434–36, 68 S.Ct. 131. In that case, the carrier's few interstate trips (4% of all trips during the relevant period) were distributed indiscriminately to all drivers. *Id.* at 433, 68 S.Ct. 131. The Supreme

Court noted that, in practical terms, the safety concerns facing a carrier who sent *every* driver on an interstate trip would be the same if the carrier sent only *some or most* of its drivers on interstate trips. *See id.* at 434, 68 S.Ct. 131.

*Id.* at 474.

The district court in this case explicitly and closely adhered to our *Songer* decision's reasonable expectation analysis. The district court created a chart that listed each member of the Bellwether group, and included the member's title, district, and start and end dates. Then the district court looked to each member's job duties to find that, notwithstanding their different positions, members working as EOs, ST-Is, ST-IIs, SSTs, and SSs had sufficiently similar duties to belong to a class of employees known as FSEs. Tellingly, the district court delimited this class by excluding FE-Is and SCs because there was "insufficient evidence about whether the FE-Is or the SCs engaged in safety-affecting transportation duties and whether there was a reasonable expectation that their work would affect the safety of interstate transportation." The district court further delimited this class by excluding FSEs who worked on offshore projects because "the factual record is conflicting and there remain open legal issues" as to whether offshore FSEs engaged in safety-affecting transportation activities affecting interstate commerce.[3] The district court, after this extensive individualized methodology, then found: that 7 percent of projects company-wide required this class of employees to cross state lines; that CTS assigned such interstate trips indiscriminately; and that, therefore, these employees had a "reasonable expectation" that they "could be assigned to drive interstate."[4]

---

[3] We note also the district court's fact-intensive assessment even of those offshore employees as to whether they were, like Plaintiff Broussard, prohibited from driving.

[4] Echoing *Songer*, the district court emphasized that "[t]hese employees have similar job duties, were or could have been called upon to drive in interstate commerce during their employment, and receive project assignments that changed often. Any driver could have been assigned to an interstate project at any time," and concluded that "the evidence establishes

No. 12-20194

Given that this analysis adheres to the reasonable expectation approach of *Songer*, we cannot say that, after using an individualized analysis to form the class of employees known as land-based FSEs, the district court erred by not repeating the individualized analysis to measure the interstate activity of each member of the class.

Relevant other Fifth Circuit and Supreme Court decisions are consistent with *Songer*. For example, in *Barefoot*, a unanimous panel found that twenty-six truck drivers engaged in interstate commerce even though "the drivers conceded that, among the twenty-six of them," only about "twenty trips were made across state lines." *See* 1994 WL 57686, at *3. Likewise, in *Morris*, the Supreme Court found that forty-three drivers, who, as a group, devoted "about 4% of their time and effort . . . to services in interstate commerce," engaged in interstate commerce even though two of the drivers did not take interstate trips. 332 U.S. at 432-34. By contrast, the circuit court cases cited by Appellants in support of an employee-by-employee analysis are distinguishable.[5]

Appellants argue that, by using "singular nouns and pronouns," the relevant statutes and regulations, including 29 U.S.C. §§ 207(a), 213(b) and 29 C.F.R. § 782.2, envision an employee-by-employee analysis. Read in context, however, the use of singular terms suggests only that a district court should use an individual analysis to determine if an employee belongs to a particular "class." *See, e.g.*, 29 C.F.R. § 782.2 (observing the exemption depends on "the *class* of work involved in the employee's job" and "extends to those *classes* of

---

that, objectively, there was a reasonable expectation that any CTS Field Service Employee could be assigned to drive interstate."

[5] For example, in *Goldberg v. Faber Indus., Inc.*, the Seventh Circuit declined to apply the MCA exemption to drivers based, in part, on the fact that the drivers were assigned to "designated" intrastate routes. 291 F.2d 232, 234 (7th Cir. 1961). By contrast, in this case, interstate routes were assigned indiscriminately. Moreover, the Seventh Circuit in *Goldberg* positively applied *Morris*, which, as noted already, involved a group that had two non-interstate drivers. *See* 291 F.2d at 235.

employees" who engage in safety-affective activities) (emphases added). As discussed above, by finding that certain employees had similar-enough duties to belong to a class of employees known as FSEs, and then by limiting this class, the district court used such an analysis.[6]

Because *Songer* forecloses an employee-by-employee analysis, and because Appellants do not provide a persuasive reason to depart from *Songer*, the question narrows to whether the district should have used a district-by-district or company-wide analysis to measure the interstate activities of land-based FSEs.

Given the arguments advanced by the parties, and the facts of the case, a company-wide analysis was appropriate. The FLSA provides that overtime-pay requirements and exemptions apply only to an "employer." *See* 29 U.S.C. § 207(a)(1). The district court found that CTS "was Plaintiffs' only 'employer' during the relevant time periods; Plaintiffs were not employed by the various districts." Appellants did not argue in district court that the districts were their employers, and they do not challenge on appeal the finding that CTS "was [their] only 'employer.'" Appellants therefore have waived any argument to the contrary.[7] *See F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1326-27 (5th Cir. 1994).

---

[6] Appellants also maintain that CTS is judicially estopped from arguing for a company-wide analysis because CTS argued for an employee-by-employee analysis in *Yaklin v. W-H Energy Servs., Inc.*, No. C-07-422, 2008 WL 1989795, at *1 (S.D. Tex. May 2, 2008) (unpublished). To the extent that this estoppel argument is within the scope of our limited interlocutory review, *see Tanks*, 417 F.3d at 461, it is unpersuasive. Although "judicial estoppel is not governed by inflexible prerequisites," its application generally requires, among other things, that "a court accepted the prior position." *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012) (internal quotation marks omitted). Even if CTS did argue for an employee-by-employee analysis in *Yaklin*, Appellants do not argue, and the *Yaklin* opinion does not support, that the *Yaklin* court accepted CTS' argument. *See* 2008 WL 1989795, at *3.

[7] The FLSA defines an "employer" to "include[ ] any person"—that is, "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons," 29 U.S.C. § 203(a)—"acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Because we find that waiver applies, we decline to address whether the districts were "employers" under this definition.

No. 12-20194

By waiving this textual argument, Appellants' opposition to a company-wide analysis reduces to their contention that "the percentages of interstate travel for [some districts] tell courts nothing about the reasonable expectation of a worker dispatched from [other districts]." However, *Songer* looks at the reasonable expectations of the employees *as a class*, even if, in doing so, the effect is to apply the MCA exemption to employees who rarely, or never, engage in interstate commerce. *See* 618 F.3d at 472-76. *Songer* does not instruct us to subdivide a class of employees by geography, and the facts of this case do not support such an artificial division. For example, the districts: operated under a single DOT number; were not independent legal entities; borrowed personnel and equipment from each other; and solicited and accepted projects outside their geographic areas. Accordingly, as the district court found, "[t]here is insufficient evidence or legal authority . . . to treat the districts separately instead of conducting the MCA Exemption analysis based on CTS as a single 'employer.'"[8]

---

[8] With the highest respect, we are unconvinced by the dissenting opinion's insistence that precedent "prohibits" courts from determining a particular employee's reasonable expectation by reference to a class of similarly situated employees. *Post*, at 14. Indeed, the dissent itself uses this "prohibited" mode of analysis by classifying employees by districts. In what it deems "The Proper Analysis," the dissent does not "make a determination *vel non* for each plaintiff-employee," but instead divies up the plaintiffs by district: "the vast majority of jobs handled by the Alice, Angleton, Bridgeport, and Broussard districts were purely intrastate jobs." *Post*, at 30, 31. As evidence of the reasonable expectation of a particular employee, the dissent looks to the percentage of each *district's* jobs that were interstate: "in Alice and Bridgeport, *less than one percent* of the jobs handled by those districts during the period recorded were interstate." *Post*, at 31. The dissent concludes its district-by-district analysis: "Based on this evidence, a reasonable factfinder could determine that the likelihood of these field service employees in the Alice, Angleton, Bridgeport, and Broussard districts driving interstate is so minimal and remote, they cannot be 'reasonably expected' to be 'called upon in the ordinary course of [their] work to [drive interstate].'" *Post*, at 32 (quoting *Songer*, 618 F.3d at 474). The dissent may disagree with our choice of classification, preferring a district-by-district class to company-wide class, but it is still utilizing classifications in its analysis.

The dissent further does not convincingly explain how its proposed individualized methodology coincides with *Songer* or *Morris*. As we explained, *Morris* found jurisdiction to regulate "all of defendant carrier's drivers, even though two of the 42 drivers had not engaged in interstate trips." *Songer*, 618 F.3d 467. If *Morris* applied an "individualized" assessment of the two employees that had not engaged in interstate trips, it could not have found that these employees had a reasonable expectation of engaging in interstate trips: they had not

No. 12-20194

In sum, the district court did not err in using a company-wide analysis because this court's precedent effectively precludes an employee-by-employee analysis, and because neither the parties' arguments, nor the relevant facts, support a district-by-district analysis.[9]

## CONCLUSION

Accordingly, we AFFIRM the district court's application of the MCA exemption.

---

done so before. It is only by reference to other employees' experience that *Morris*'s conclusion makes sense. The dissent revealingly explains that *Songer* "made the common sense observation that, because of company policies that were *factually common to all employees* (*i.e.*, the indiscriminate assignment of interstate trips), *each and every* employee, all of whom had the *same* likelihood of driving interstate, was reasonably likely to drive interstate." *Post*, at 24. What the dissent frames as a "common sense observation" we call a class-based analysis; there is a minimal semantic gap between our views. Moreover, the district court made this exact "common sense observation" when it found that "[t]hese employees have similar job duties, were or could have been called upon to drive in interstate commerce during their employment, and receive project assignments that changed often. Any driver could have been assigned to an interstate project at any time." Accordingly, both of our opinions use classifications to determine whether a particular employee has a reasonable expectation. We simply part ways over the relevant class of comparison, and the factual conclusion reached by the district court, "that the evidence establishes that, objectively, there was a reasonable expectation that any CTS Field Service Employee could be assigned to drive interstate."

[9] CTS also argues that the district court erred by extending its January 11, 2012 rulings to all Plaintiffs, and not just the Bellwether group. Even if this argument is within the scope of our limited interlocutory review, *see Tanks*, 417 F.3d at 461, it is unpersuasive. Appellants rely on an Eleventh Circuit case, *Hogan v. Allstate Insurance Co.*, for the proposition that Federal Rule of Civil Procedure 56(c) requires that "a minimum 10-day notice . . . must be explicitly given to *all* plaintiffs," and not just "test plaintiffs." 361 F.3d 621, 628 (11th Cir. 2004) (per curiam). However, Rule 56 was amended in 2010—subsequent to the *Hogan* decision, but before the district court's January 11, 2012 rulings—to remove the referenced ten-day notice requirement. *See Atkins v. Salazar*, 677 F.3d 667, 678 n.15 (5th Cir. 2011) (per curiam). Further, CTS requested that the district court's rulings apply to all plaintiffs in a March 2011 filing, and then did so again in its motion for reconsideration. As a result, attorneys for the non-Bellwether Plaintiffs, who also represented the Bellwether Plaintiffs, had "a full opportunity to argue against" the application of the district court's rulings to all Plaintiffs. *See Atkins*, 677 F.3d at 681.

No. 12-20194

JAMES L. DENNIS, Circuit Judge, dissenting:

I respectfully dissent because the district court and the majority of this court have departed from controlling Supreme Court and circuit precedent and have misinterpreted and misapplied Department of Labor ("DOL") regulation 29 C.F.R. § 782.2(a) and this court's decision in *Songer v. Dillon Resources, Inc.*, 618 F.3d 467 (5th Cir. 2010), to except more than a hundred employees from overtime wage protection under the Fair Labor Standards Act ("FLSA").

The issue is whether the Motor Carrier Act ("MCA") exemption to the FLSA excepts the oil-well-service plaintiffs-employees here from overtime protection because their individual job activities can conceivably affect the safety of interstate transportation.  If an employee is subject to the jurisdiction of the Department of Transportation ("DOT") under the MCA to regulate the qualifications and maximum hours of service of the employee, then that employee loses the FLSA's protection over overtime pay.  An employee is subject to such MCA jurisdiction only, *inter alia*, if he is reasonably likely to carry out job duties affecting the safety of interstate transportation (or international transportation, although such is not involved in this case).

In *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695 (1947), the Supreme Court held that, when the MCA exemption is invoked as a defense in an FLSA action for overtime pay, (1) the district court must "determine whether or not the activities of *each* [employee]" are reasonably likely to affect the safety of interstate transportation and that (2) the court may declare exempt from overtime wage protection *only* "*those* [employees] who are engaged in such activities." *Id*. at 707-08 (emphasis added).[1]  Later that same year, in *Morris v.*

---

[1] As further explained below, for an employee to be "engaged in" activities that affect the safety of interstate transportation means that "the employee's job duties are such that he is (*or is likely to be*) called upon in the ordinary course of his work to perform safety-affecting activities." *E.g.*, *Songer*, 618 F.3d at 474 (quoting 29 C.F.R. § 782.2(b)(3)) (alteration omitted, emphasis added).

14

*McComb*, 332 U.S. 422 (1947), the Court reaffirmed that, in "an action to recover overtime compensation for individual employees," it is "necessary to determine" "the extent to which" an employee seeking overtime pay carried out activities reasonably likely to affect the safety of interstate transportation. *Id.* at 430.

Thus, under the Supreme Court's jurisprudence, MCA jurisdiction turns on the individual job circumstances of "each" employee seeking overtime pay. *Pyramid Motor Freight Corp.*, 330 U.S. at 707. An employee loses the FLSA's protection over overtime pay under the MCA exemption *only* if the employee, based on the circumstances of *his* job, is reasonably likely to carry out activities affecting the safety of interstate transportation operations. *See also Mitchell v. C & P Shoe Corp.*, 286 F.2d 109, 114 (5th Cir. 1960) (holding that MCA jurisdiction turns on the "activities of the particular employee, rather than the employer"); *accord Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37, 42-43 (5th Cir. 1962). The Supreme Court's jurisprudence requiring individual analysis of each employee's actual job circumstances for purposes of the MCA exemption has not been overruled or modified.

Here, however, the district court and the majority have failed to focus on the circumstances of each employee's actual job, as required by law, to determine whether that employee is exempted from overtime wage protection. Instead, they have erroneously concluded that, when a district court deems multiple employees' job duties and assignments to be, in the court's opinion, "sufficiently similar," the court may lump all of the employees together in a single "group" (the district court's word) or "class" (the majority's word)[2] so as to determine on a "company-wide basis" the applicability of the MCA exemption "to that group as a whole." 846 F. Supp. 2d 678, 694-95; *ante*, at 9-10. According to the district

---

[2] I note in the interest of clarity that this case is not a class action. *See* Fed. R. Civ. P. 23 (class action rules). The distinct "class" concept the majority creates today is unique to the MCA exemption to the FLSA and is unrelated to class actions under Rule 23.

court, this "group"-based analysis that is conducted on a "company-wide basis" allows the court to look at the job activities of the national company's Wyoming employees, who are *not* parties to this litigation seeking overtime pay, and to declare that, based on *their* activities, the Texas and Louisiana employees in *this case* are exempted from overtime wages. The district court recognized that, factually, the Wyoming employees are distinct from the Texas and Louisiana employees. Specifically, the district court recognized that, as a matter of fact, the Wyoming employees are very likely to affect the safety of interstate transportation in the course of their jobs and the Texas and the Louisiana employees are not. Nevertheless, the district court concluded that, as a result of "company-wide," "group-based" analysis, the Wyoming employees, who are not seeking overtime wages in this case, and the Texas and Louisiana employees, who are, should all be lumped together and should all be denied overtime wage protection despite their factual differences. The majority of this court now affirms.[3]

---

[3] The majority characterizes the differences in our analysis as a "minimal semantic gap." *Ante*, at 13 n.8. Respectfully, it appears that the majority has, with the best of intentions, mistakenly elided the diverge in our views. It is uncontroversial and I of course agree that, when particular evidence is *factually common* to multiple employees, such evidence is indeed relevant to the individual job circumstances of multiple employees. E.g., if an employer applies a particular company policy to all of its employees, then such policy obviously illuminates the individual job circumstances of each employee. Such analysis, however, is not what the district court here did. As further explained below, the district court recognized that the evidence regarding the job circumstances of the Wyoming employees differed materially from the evidence regarding the job circumstances of the Texas and Louisiana employees. Looking at statistical evidence, the district court concluded that the Wyoming employees were very likely to carry out job activities affecting the safety of interstate transportation. And, looking at other statistical evidence, the district court further concluded that many of the Texas and Louisiana employees were very unlikely to do such. Despite the *factual* differences, however, the district court ruled that, *as a matter of law*, the likelihood of the Wyoming employees affecting interstate transportation safety should be imputed to the Texas and Louisiana employees. The difference between the majority's analysis and my own is not a semantic question as to how to refer to evidence that is factually common to multiple

(continued...)

No. 12-20194

Thus, in granting and affirming summary judgment for Coil Tubing Services, the employer here, my colleagues mistakenly have failed to require the employer to carry its heavy burden under its affirmative MCA exemption defense to show, on an individual basis, that each employee's job activities demonstrate that he is exempt from FLSA overtime protection. As support for this "group"- or "class"-based analysis that is conducted on a "company-wide basis," the district court and majority point to the DOL's § 782 regulations and this court's recent *Songer* decision. The district court and the majority, unfortunately, have misread these sources. The DOL's § 782 regulations and *Songer* did not abrogate, nor could they have abrogated, the Supreme Court's jurisprudence requiring individual analysis of each employee's job circumstances. Because the district court's legal errors skewed and undermined its entire decision, its summary judgment should have been reversed rather than affirmed.

## I. *Introduction*

Under the FLSA, employers are generally prohibited from "employ[ing] any of [their] employees" "for a workweek longer than forty hours unless such employee receives [time-and-a-half compensation for the overtime hours]." 29 U.S.C. § 207(a)(1).[4] Under the MCA exemption to the FLSA, that entitlement

---

[3] (...continued)
employees. The difference is a substantive one, *viz.*, whether courts are permitted under the MCA exemption to use a "group"- or "class"- based analysis (or however else it may be called) that imputes "facts," as a matter of legal fiction, to an employee when such 'facts' are belied by the evidence.

[4] The FLSA's protection over overtime wages reaches only those employees who are "engaged in commerce or the production of goods for commerce," and "commerce" "means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. §§ 207(a)(1), 203(b). Here, it is undisputed that the employees at issue in this case are "engaged in commerce" within the
(continued...)

No. 12-20194

to overtime pay "shall not apply with respect to" "any employee with respect to whom the Secretary of Transportation [that is, the DOT] has power[5] to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 [that is, the MCA]." *Id*. § 213(b)(1). Thus, under the FLSA, an employee is entitled to overtime pay unless the employee falls within the scope of the DOT's regulatory jurisdiction under the MCA or is otherwise exempt from the FLSA for reasons not involved in this case.[6]

---

[4] (...continued)
meaning of the FLSA. The disputed issue is rather whether the FLSA's protection over overtime wages does not apply to the employees because the DOT "has power to establish qualifications and maximum hours of service [of them] pursuant to the provisions of section 31502 of Title 49." *Id*. § 213(b)(1).

[5] It is well settled that the MCA exemption turns on whether the DOT has power—*i.e.*, legal jurisdiction—to regulate the worker's qualifications and maximum hours of service under the MCA, not whether the DOT has actually exercised its power to do so. *Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 47-48 (1943); *Songer*, 618 F.3d at 472.

[6] Although the scope of the MCA exemption to the FLSA and the scope of the DOT's regulatory jurisdiction are generally one and the same, there may be an exception to that rule following passage of the SAFETEA–LU Technical Corrections Act of 2008, Pub. L. 110–244, 122 Stat. 1572, which, in part, provides generally that, from the date of the act's enactment, June 6, 2008, the MCA exemption *does not apply* to employees who would otherwise fall within its ambit if the following requirements are met:

> (1) [the employee] is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);
> (2) [the employee's] work, in whole or in part, is defined—
> (A) as that of a driver, driver's helper, loader, or mechanic; and
> (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles—
> (i) designed or used to transport more than 8 passengers (including the driver) for compensation;
> (ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or
> (iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49,

(continued...)

18

No. 12-20194

MCA jurisdiction (that is, the jurisdiction of the DOT under the MCA to establish the qualifications and maximum hours of service of employees) has three elements.  First, under 49 U.S.C.  § 31502(b), the DOT may regulate the qualifications and maximum hours of service of only those workers who are employed by either a "motor carrier" or a "motor private carrier."[7]  A "motor carrier" is "a person providing motor vehicle transportation for compensation." *Id*. § 13102(14).  A "motor private carrier" is generally a person who transports his own property "for sale, lease, rent, or bailment or to further a commercial enterprise."  *Id*. § 13102(15).[8]

Second, the DOT's jurisdiction "is limited to those employees whose activities affect the safety of [the transportation] operation," and the DOT "has

----

[6] (...continued)
> United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code; and
> (3) [the employee] performs duties on motor vehicles weighing 10,000 pounds or less.

*Id*. § 306(a), (c).  For a discussion of the SAFETEA-LU Technical Corrections Act, see, e.g., *McCall v. Disabled Am. Veterans*, 723 F.3d 962 (8th Cir. 2013).  This interlocutory appeal does not address the district court's resolution of the plaintiffs' post-June 6, 2008, claims to which the SAFETEA-LU Technical Corrections Act applies, but rather only the district court's resolution of the pre-June 6, 2008, claims, and therefore, the act is not implicated here.

[7] Section 31502(b) provides:
> The Secretary of Transportation may prescribe requirements for—
> (1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and
> (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.

[8] "The term 'motor private carrier' means a person, other than a motor carrier, transporting property by motor vehicle when (A) the transportation is as provided in section 13501 of this title [*see infra*, note 10]; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise."  *Id*. § 13102(15).

19

no jurisdiction to regulate the qualifications or hours of service of any others." *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 553 (1940). To determine whether an employee's job activities affect the safety of the transportation operation, the courts have clarified the relevant inquiry to be whether "the employee's job duties are such that he is (or is likely to be) called upon in the ordinary course of his work to perform safety-affecting activities." *E.g.*, *Songer*, 618 F.3d at 474 (quoting 29 C.F.R. § 782.2(b)(3)) (alteration omitted). Put another way, the question is whether the employee "can be reasonably expected" to engage in activities that affect the safety of transportation. *Id.* If the likelihood of engaging in safety-affecting activities is too remote and improbable, then the employee will not fall under MCA jurisdiction. *Coleman v. Jiffy June Farms, Inc.*, 324 F. Supp. 664, 670 (S.D. Ala. 1970), *aff'd*, 458 F.2d 1139 (5th Cir. 1971); *Kimball v. Goodyear Tire & Rubber Co.*, 504 F. Supp. 544, 548 (E.D. Tex. 1980); *Yaklin v. W-H Energy Servs., Inc.*, No. 07-CV-422, 2008 WL 4692419, at *6 (S.D. Tex. Oct. 22, 2008).[9]

Third, the DOT's jurisdiction reaches only (1) international transportation, *i.e.*, transportation that crosses the national border, (2) interstate transportation, *i.e.*, transportation that crosses state borders, or (3) intrastate transportation of goods in the flow of interstate commerce. 49 U.S.C. §§ 31502(a), 13501; *Songer*, 618 F.3d at 472.[10] Generally speaking, there must be an international or

---

[9] The DOT has created a "four-month rule" under which "[e]vidence of driving in interstate commerce or being subject to being used in interstate commerce" is "proof" that the driver falls under MCA jurisdiction "for a 4-month period from the date of the proof." 46 Fed. Reg. 37902.

[10] Section 31502(a) provides, "This section applies to transportation—(1) described in sections 13501 and 13502 of this title; and (2) to the extent the transportation is in the United States and is between places in a foreign country, or between a place in a foreign country and a place in another foreign country."

(continued...)

No. 12-20194

interstate nexus of some sort, as the DOT's jurisdiction does not reach purely intrastate transportation. *E.g.*, *Kline v. Wirtz*, 373 F.2d 281, 282 (5th Cir. 1967); *Walling v. Comet Carriers*, 151 F.2d 107, 110 (2d Cir. 1945).

In sum then, under the MCA, the DOT may regulate the qualifications and maximum hours of service only for (1) employees of a "motor carrier" or "motor private carrier" (2) whose activities affect the safety of transportation, (3) and that transportation has an international or interstate nexus.

Here, there is no question of the first two elements. First, there is no question that Coil Tubing Services, an oil-well-service company, requires its employees in the course of their jobs to transport the company's property, including chemicals, tools, and coil tubing equipment, between the company's

---

[10] (...continued)
Section 13501 provides:

> The Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier—
> (1) between a place in—
> (A) a State and a place in another State;
> (B) a State and another place in the same State through another State;
> (C) the United States and a place in a territory or
> possession of the United States to the extent the transportation is in the United States;
> (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
> (E) the United States and a place in a foreign country to the extent the transportation is in the United States; and
> (2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.

Under our case law, § 13501 also impliedly includes within its ambit "the intrastate transport of goods in the flow of interstate commerce." *Songer*, 618 F.3d at 472; *Shew v. Southland Corp.*, 370 F.2d 376, 380-81 (5th Cir. 1966).

Section 13502 relates to Alaska and is irrelevant here.

district offices and the jobsites, the customers' wells, and therefore qualifies as a "motor private carrier" under the statute. *See Sinclair v. Beacon Gasoline Co.*, 447 F. Supp. 5, 10 (W.D. La. 1976), *aff'd*, 571 F.2d 978 (5th Cir. 1978) (holding that "a natural gas well servicing company whose drivers carry tools and equipment in company-furnished pickup trucks . . . is private carrier of property by motor vehicle"). Second, although the principal job of the employees here is to service the customers' oil wells and that, by itself, does not have an affect on the safety of transportation, the employees also transport Coil Tubing Services's property, *i.e.*, the equipment, etc., to the jobsite via motor vehicle, and "[i]t is obvious that one who drives a vehicle" "directly affects the safety of such operations as long as he is driving." *Crooker v. Sexton Motors, Inc.*, 469 F.2d 206, 209 (1st Cir. 1972); *see also Songer*, 618 F.3d at 473. Thus, there is no question that, as the employees here are required to drive motor vehicles, they affect the safety of transportation when doing so. The third requirement for MCA jurisdiction is the interstate nexus, *i.e.*, that the employee's job activities are such that the employee is reasonably likely to affect the safety of *interstate*, not merely intrastate, transportation.[11] Whether each employee here is reasonably likely to drive interstate and thus affect the safety of interstate transportation is the disputed issue in this case.

---

[11] There is no contention in this case that Coil Tubing Services employees work internationally or transport goods in the flow of interstate commerce. Thus, the only question here is whether an employee's actual job activities affect interstate transportation safety.

No. 12-20194

## II. *The District Court's and Majority's Flawed "Group"- or "Class"-Based Analysis*

### A.

From November 2005 through November 2008, Coil Tubing Services employed the 191 plaintiffs-appellees in this case as "field service employees" tasked with servicing clients' oil wells. During the relevant period, the company organized its business into six "districts": the "Alice," "Angleton," and "Bridgeport" districts in Texas, the "Broussard" and "Bossier City" districts in Louisiana, and the "Rock Springs" district in Wyoming. However, none of the plaintiffs in this case worked out of the Bossier City or Rock Springs districts; they all worked out of the Alice, Angleton, Bridgeport, and Broussard districts. *See* 846 F. Supp. 2d at 686 (listing employees, titles, district assignments, and start and end dates of bellwether plaintiffs).

Initially, in its first summary-judgment ruling that was later vacated and supplanted by the decision now under review,[12] the district court held that there was a reasonable likelihood of employees in the Angleton and Broussard districts driving interstate, and, thus, they fell under the MCA and were not entitled to FLSA overtime pay. But, the district court further held that the likelihood of employees in the Alice and Bridgeport districts driving interstate was "so low" that there was not an "objectively reasonable expectation" of those employees driving interstate, and, thus, they did not fall under the MCA exemption. Coil Tubing Services argued that employees in *all* of the districts should fall under the MCA because, in all of the company's districts nationwide, approximately seven percent of the "land project" (as opposed to offshore) jobs "required one or

---

[12] The district court's first summary-judgment ruling has not been published but it is included in the record on appeal. *See* R. 7233-97.

## No. 12-20194

more service crews to mobilize coil tubing equipment across state lines." But the district court, in its first decision, agreed with the plaintiffs that the company's seven percent "aggregate" figure was "skewed by the extremely large number of interstate projects handled by the Rock Springs District" in Wyoming, in which none of the plaintiffs actually worked. "More than 56% of the Rock Springs projects were out-of-state," the district court explained, "while the other districts had far fewer interstate projects." By contrast, the district court proceeded to explain, in Alice and Bridgeport, less than one percent of the jobs handled in those districts during the relevant time were interstate; in Angleton, less than two percent of the jobs were interstate; and, in Broussard, around five percent of the jobs were interstate.

After the district court's first ruling, Coil Tubing Services moved the court to reconsider, and the court did. In its second decision, which is now under review, the district court cited regulations, codified at 29 C.F.R. § 782, of the DOL, the agency charged with enforcing the FLSA. 846 F. Supp. 2d at 690.[13] Those regulations of the DOL set out "the construction of the law [regarding the MCA exemption] which the [DOL] believes to be correct." 29 C.F.R. § 782.0. The regulations state, "[t]he [MCA exemption] depends both on the class to which his

---

[13] As an initial matter, the district court should have recognized that the DOL does not have authority to define the scope of MCA jurisdiction, as the DOL's regulations acknowledge. 29 C.F.R. § 782.1(a) ("The Fair Labor Standards Act confers no authority on the Secretary of Labor or the Administrator to extend or restrict the scope of this exemption."). Accordingly, the DOL's views on the scope of MCA jurisdiction are not entitled to deference from the courts. *Levinson v. Specter Motor Serv.*, 330 U.S. 649, 676-77 (1947); *Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 251 n.5 (3d Cir. 2005); *Troutt v. Stavola Bros., Inc.*, 107 F.3d 1104, 1108 n.1 (4th Cir. 1997); *Benson v. Universal Ambulance Serv., Inc.*, 675 F.2d 783, 785 (6th Cir. 1982); *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 661 n.1 (7th Cir. 2011). *But see Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 182 n.4 (11th Cir. 1991).

employer belongs and on the class of work involved in the employee's job."  *Id*. § 782.2(a).  And they proceed to explain:

> The power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees, on which exemption depends, extends to those classes of employees and those only who: (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act, and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

*Id*. (citations omitted).

Based on § 782's language regarding "classes of employees" and the "class of work involved in the employee's job," the district court concluded that it should *not* address whether "the activities of each *individual* employee in issue directly affected the safety or operation of commercial motor vehicles in interstate transportation."  846 F. Supp. 2d at 694 (emphasis added).  Rather, the district court concluded that it must apply a "group analysis" on a "company-wide basis."  *Id*. at 694-95.

To conduct such a "group analysis" on a "company-wide basis," the district court defined a "group" of Coil Tubing Service employees that it named "field service employees."  *Id*. at 684.  The court defined that "group" to encompass all of Coil Tubing Services's employees that had "job duties and assignments" that, in the court's opinion, were "sufficiently similar to permit some grouping."  *Id*. at 694-95.  Then, the district court turned to the fact that seven percent of all jobs companywide were interstate (that is, the aggregate figure that the district

court had previously rejected as "skewed") and reasoned that—*even though* the seven percent figure did not accurately represent the experience of the company's Texas and Louisiana employees—it nevertheless somehow applied to the Texas and Louisiana employees under the district court's "company-wide" "group analysis." *Id.* at 703-04 & n.48. Accordingly, the district court held that seven percent of jobs companywide being interstate was sufficient to subject *all* employees, regardless of their districts, in the "field service employees" "group" to MCA jurisdiction and granted summary judgment to Coil Tubing Services regarding the FLSA overtime pay claims of every employee in the judicially defined "group." *Id.* at 703, 715.[14] In essence, the district court held that, because the company has employees in Wyoming who very frequently carry out duties affecting the safety of interstate transportation but are not parties to this case, that somehow creates a legal fiction that the plaintiffs here, the company's employees in Louisiana and Texas, are deemed to also carry out those same duties just as often. The district court decided such even though the evidence showed it to be false.

Now, the majority affirms the district court's analysis and, in a published opinion, sets it as the law of this circuit. According to the majority, to determine whether employees are subject to MCA jurisdiction, courts should use an "extensive individualized methodology" to include all of a company's employees with "sufficiently similar duties" (in the court's opinion) in a judicially defined "class" of employees and then decide whether such "class," rather than the individual employees within it, has a reasonable expectation of carrying out

---

[14] The district court's grant of summary judgment for Coil Tubing Services was partial. The district court ruled in favor of some of the plaintiffs in certain regards that were not appealed and, thus, are not at issue now.

activities that affect the safety of interstate transportation. *Ante*, at 9-10. Without getting into the details about who exactly is in the "class" here and what connection they have to the case, if any, the majority affirms the district court's analysis. *See id.*[15]

In short, in deciding MCA jurisdiction (specifically, whether an employee's job duties are reasonably likely to affect the safety of interstate transportation), the district court and the majority of this court agree that, if employees have "sufficiently similar" job duties, the court may lump them all together into a single "group" or "class" and then decide the jurisdictional question with respect to the "group" or "class" rather than the individual employees in it. This is wrong. Contrary to the district court and the majority, an employee is exempt from FLSA overtime protection only if the MCA applies to that employee *individually—i.e.*, *that employee's* actual job circumstances are such that the employee is reasonably likely to affect the safety of interstate transportation. The relevant Supreme Court and circuit precedent requires individual analysis of the employee's actual job and prohibits the district court's and majority's "group"- or "class"-based analysis.

---

[15] The majority says that the "parties do not contest that an individualized analysis is appropriate to determine whether Appellants have similar-enough duties to belong to the class of employees that engages in safety-affecting activities." *Ante*, at 7. This statement about what the parties "do not contest" misrepresents the employees' position. The employees indeed challenge the conclusion that they should be categorized and analyzed as "a class of employees" with "similar-enough duties." They contend that the requisite MCA analysis encompasses no judicial sorting of employees into categories at all. *See* Appellants' Br. 17 ("[T]he MCA is analyzed on an individual basis . . . . No meaningful authority, however, supports the whole company analysis proposed by CTS. Thus, the district court erred by adopting a modified version of it."), 24 ("[A]n individual analysis is required to determine the character and timing of the employee's duties, and therefore the application of the exception.").

It appears that the district court and the majority have adopted their improper analysis based on two misunderstandings about the jurisprudence. First, the district court and majority appear to believe that the DOL's regulations codified at 29 C.F.R. § 782.2, which refer to "classes of employees," authorize the "group"- or "class"-based analysis that they applied here. *See* 846 F. Supp. 2d at 690 (citing § 782.2(a)); *ante*, at 5-6 (same). Second, the district court and majority also contend that their "group"- or "class"-based analysis is required by *Songer v. Dillon Resources, Inc.*, a 2010 decision of this court. *See* 846 F. Supp. 2d at 694 (citing *Songer*); *ante*, at 8-9 (same). They are mistaken on both points. The history of the FLSA and MCA, to which I now turn, clearly indicates that the MCA exemption has *always* turned on the job circumstances of each individual employee.

## B.

### 1.    *The Statutory Enactments*

The MCA was enacted in 1935 "to regulate transportation by motor carriers." § 202(a), 49 Stat. 543. When first enacted, the statute was enforced not by the DOT, which was not created until decades later, but by a predecessor agency, the Interstate Commerce Commission ("ICC"). §§ 203(a)(3), 204.

During the initial years following the ICC's creation in 1935, the agency promulgated a series of regulations imposing certain rules regarding the qualifications and maximum hours of service for certain workers, but the agency did not issue any formal determinations as to what it perceived to be the scope or the reach of its regulatory authority. For example, in 1936, the year after the MCA was enacted, the ICC promulgated its first regulations establishing

qualifications for certain drivers while expressing no view on the ICC's authority to regulate workers other than drivers. *See* Ex parte No. MC–4, 1 M.CC. 1.

In 1938, the FLSA was enacted to "eliminate" "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." § 2, 52 Stat. 1060. In its original form, the FLSA contained, as it still does today, the MCA exemption. § 13(b)(1) ("The provisions of section 7 shall not apply with respect to any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935.").

## 2. *The Interstate Commerce Commission's Jurisdictional Pronouncements*

The MCA exemption in the FLSA "brought sharply into focus the coverage of employees by the Motor Carrier Act." *Am. Trucking Ass'n*s, 310 U.S. at 540. In 1938, the ICC, noting that the FLSA had made the question of its jurisdiction important, instituted proceedings "for the purpose of determining the extent of our jurisdiction under section 204(a) of the Motor Carrier Act, 1935, to establish reasonable requirements with respect to qualifications and maximum hours of service of employees of common and contract carriers and of private carriers of property by motor vehicle." Ex parte No. MC–28, 13 M.C.C. 481, 481 (1939). The ICC described the dispute before it as follows:

> Representatives of common and contract carriers, with one exception, assert that our jurisdiction under section 204(a)(1) and (2) extends to all employees of common and contract carriers and is not limited to those employees whose activities affect the safety of operation. Representatives of organized labor, on the other hand, contend that our jurisdiction is limited to

employees whose activities affect the safety of operation.

*Id.* at 482.  In 1939, the ICC sided with organized labor and announced that the agency's jurisdiction extends only to those employees "whose activities affect the safety of operation of motor vehicles engaged in transporting passengers and property in interstate and foreign commerce." *Id.* at 488.  That, however, left open the question, what sorts of employees have activities that affect the safety of operation?  In that regard, the ICC wrote:

> It is clear to us that we have power to prescribe qualifications and maximum hours for drivers and their helpers employed by private carriers of property who are engaged in driving or operating motor vehicles transporting property in interstate and foreign commerce.  It may be that the activities of other employees are such that "to promote safety of operation" we have power to prescribe qualifications and maximum hours of service for them.  As to what classes or types of employees, if any, may be included in this category, we do not decide here.

*Id.* at 483.

This, it appears, was the first time the phrase "classes of employees" (to be precise, "classes or types of employees") appeared in the law books in connection with the MCA.  Here, the ICC used the phrase to refer to categories of job duties and to distinguish between those duties that affect the safety of operation (and thus fall within the ICC's jurisdictional ambit) and those that do not (and thus do not).  The ICC thought it clear that "drivers" and "their helpers"

No. 12-20194

are "classes or types of employees" that affect the safety of operation but did not decide "what [others], if any, may be included in this category." *Id*.[16]

In 1941, the ICC began looking at other classes of employees, specifically, "mechanics and other garage workers," "loaders," and "dispatchers." Ex parte No. MC–2, 28 M.C.C. 125, 132. As for "mechanics," the ICC concluded that they "devote a large portion of their time to activities which directly affect the safety of operation of motor vehicles operated in interstate or foreign commence" and, thus, fall within the ICC's jurisdiction. *Id*. at 133. But, as for "other garage employees," such as "men who do nothing but paint vehicles," their work, the ICC concluded, does not affect the safety of operation, and thus, the ICC may not regulate them. *Id*. As for "loaders," "whose sole duties are to load and unload motor vehicles and transfer freight between motor vehicles and between the vehicles and the warehouse," they too fell within the ICC's jurisdiction, the agency concluded, because "[t]he evidence makes it entirely clear that a motor vehicle must be properly loaded to be safely operated on the highways of the country." *Id*. at 133-34. But "dispatchers," the ICC concluded, do not affect the safety of operations. *Id*. at 135. And, the ICC reaffirmed its prior determination that "driver's helpers," like the drivers themselves, affect safety of operations. *Id*. at 136. In determining that "mechanics," "loaders," and "driver's helpers" carry out job duties that affect the safety of transportation, the ICC carefully

---

[16] Shortly after the ICC's decision in Ex parte No. MC–28  issued, a number of companies challenged the agency's conclusion that its jurisdiction reaches only those employees whose activities affect the safety of operation, but the ICC reaffirmed its initial decision. No. MC–C–189, 16 M.C.C. 497 (1939). The issue was brought to the Supreme Court, and, in 1940, the Court agreed with the ICC that the agency's jurisdiction "is limited to those employees whose activities affect the safety of operation" and it "has no jurisdiction to regulate the qualifications or hours of service of any others." *Am. Trucking Ass'ns*, 310 U.S. at 553.

31

No. 12-20194

defined what it meant by each of those terms, delineating who should, and who should not, be considered each.  Finally, the ICC concluded that *no other* employees of motor carriers and motor private carriers besides "drivers and those classes of employees" already discussed "perform duties which directly affect safety of operation." *Id*. at 139.  In sum, in 1941, the ICC determined that "drivers," their "helpers," "mechanics," and "loaders," as thoroughly defined by the Commission, all carry out duties affecting safety of operation and thus fall under MCA jurisdiction, and all other employees of "motor carriers" and "motor private carriers" do not.[17]

### 3.    *The Supreme Court's 1947 Trilogy*

In 1947, the Supreme Court established several important legal principles relating to the ICC's jurisdiction under the MCA.  First, in *Levinson v. Specter Motor Service*, 330 U.S. 649, the Court held that the ICC's "findings of fact" regarding whether particular job activities affect safety of operations were "squarely within the jurisdiction of the Commission" and were entitled to great deference.  *See id*. at 669, 672-73 (describing the findings of fact as having a "claim to finality" and stating that, "[w]e see no reason to question [the ICC's] considered conclusion that the activities of full-duty drivers, mechanics, loaders, and helpers, as defined by it, affect safety of operation of the carriers by whom they are employed").[18]

---

[17]    The ICC's opinion termed its determinations as to whether the work activities at issue affect safety "findings of fact" and the corresponding jurisdictional decisions "conclusions of law."  *Id*. at 138-39.

[18] The principal issue in *Levinson* was whether the ICC has jurisdiction over a "partial-duty loader"—that is, a worker who spent a "substantial part" of his working hours doing the activities that the ICC, in Ex parte No. MC–2, described as the duties of "loaders" (*i.e.*, loading

(continued...)

No. 12-20194

Second was *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, a companion case to *Levinson*. In *Pyramid Motor Freight Corp.*, the defendant-employer invoked the MCA defense, contending that the plaintiffs-employees fit into the ICC's definitions of "loaders" and, thus, fell under the MCA exemption. The district court dismissed the case, holding that determination of whether the employees carry out job duties that affect safety of operation was not the role of the court, but was rather a task for the ICC. 59 F. Supp. 341, 343-44 (1945). The Supreme Court rejected the district court's conclusion that the determination should be referred to the ICC because, in Ex Parte No. MC–2, the ICC had *already* defined the "loaders" job classification subject to MCA jurisdiction. 330 U.S. at 706-07.

> Under these circumstances, there is no occasion for us to refer to the Commission any question presented in this case . . . . The District Court must determine simply whether or not the respective employees who seek to recover overtime compensation under [the FLSA] are excluded from [doing so] because they are within the above classification ["loaders"].

*Id.* at 707. Accordingly, the Supreme Court remanded to the district court and, importantly, ordered the district court to "determine whether or not the activities of *each [employee]*, either as a whole or in substantial part, come within the Commission's definition of the work of a 'Loader.'" *Id.* (emphasis added). The Court proceeded to explain that, "[i]f none of the . . . activities of the

---

[18] (...continued)
and unloading motor vehicles and transferring freight) and the rest of his time doing other activities that did not have an effect on the safety of motor vehicle transportation operations. *Id.* at 651-52. The Court answered that question in the affirmative, holding that the ICC has jurisdiction over workers who spend a "substantial" amount of their time doing the work of loaders. *Id.* at 685.

respective respondents, during the periods at issue, come within the kind of activities which, according to the Commission, affect the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the Motor Carrier Act, then *those [employees] of which that is true* are entitled to [overtime pay under] the Fair Labor Standards Act." *Id.* at 708 (emphasis added). "On the other hand, if the whole or substantial part of [the] activities of the respective respondents, during the periods at issue, do come within the kind of activities which, according to the Commission, affect such safety of operation, then *those respondents who are engaged in such activities* are excluded from [overtime pay]." *Id.* (emphasis added). In short, the Court held in *Pyramid Motor Freight Corp.* that, in an FLSA action in which the MCA exemption is asserted as a defense, the role of the court is to determine separately whether the activities of "*each*" employee affect the safety of interstate transportation, and the court may deny overtime pay *only to* "*those [employees] who are engaged in such activities.*" *Id.*

The third and final decision in the Supreme Court's 1947 trilogy was *Morris v. McComb*, 332 U.S. 422. The question presented was whether an employee who spends most of his time at work carrying out duties that do *not* affect safety of transportation and only a fraction of his time carrying out activities that do falls under the MCA. *Id.* at 426. There, the evidence in the record showed that the employer, a cartage business, employed drivers to transport property. *Id.* at 427. About four percent of the company's jobs involved the transportation of goods moving in interstate commerce. *Id.* at 432-33. The company assigned those jobs to the drivers "indiscriminately." *Id.* at 433. The Court held that, in such circumstances, where about four percent of a

No. 12-20194

company's transportation jobs with an interstate nexus are shared indiscriminately among the company's drivers, thus making the interstate commerce trips a "natural, integral, and apparently inseparable part" of each driver's job, that amount of interstate driving was sufficient to invoke MCA jurisdiction for those drivers. *Id.* at 433-34.[19]

Importantly, *Morris* also reaffirmed *Pyramid Motor Freight Corp.*'s requirement of individual analysis of each employee's job activities. In *Morris*, the DOL, which had brought the suit, did not seek to recover unpaid overtime that was due to any particular employee, but rather sought only an injunction against the company to pay overtime in the future to any employees who would not, because of his job duties, fall under the ICC's definition of a "class of work" invoking MCA jurisdiction (*i.e.*, drivers, their helpers, mechanics, and loaders) without deciding whether any particular employee fell under such a class. *Id.* at 424-25, 430. The Court stated that, "if this were an action to recover overtime compensation for individual employees," "it would be necessary to determine" "the extent to which" the employees carried out job duties affecting the safety of transportation. *Id.* at 430. *See also Troutt v. Stavola Bros., Inc.*, 107 F.3d 1104, 1109 (4th Cir. 1997) (observing that *Morris* "followed the same approach articulated in *Pyramid*").

Thus, the legal regime after 1947, created by the ICC's jurisdictional pronouncements and the Supreme Court's decisions, provided that (1) the ICC's jurisdiction under the MCA reached only each employee whose activities affect the safety of interstate transportation operations (*Am. Trucking Ass'ns*, 310 U.S.

---

[19] The Court also held that the mechanics who work on the vehicles that spend approximately four percent of their time in interstate commerce trips fall under the MCA. *Id.* at 432 ("What is thus true for the driver is true also for the mechanic who repairs his truck.").

No. 12-20194

at 553), (2) it fell to the ICC to determine which sorts of job activities affect safety of such operations, and the ICC had done that (*Levinson*, 330 U.S. at 669, 672-73), and (3) in an FLSA action for overtime pay, it was the duty of the courts to determine through the "judicial process" whether each plaintiff's job involved, wholly or in sufficient part, a "class of work" that the ICC had determined affected interstate transportation safety (*Pyramid Motor Freight Corp.*, 330 U.S. at 698, 707; *see also Morris*, 332 U.S. at 430). And that, according to the Supreme Court, is where things stand today. Since 1947, the Supreme Court has never again addressed the MCA exemption.

### 4.    *This Circuit's Post-1947 Jurisprudence*

In the decades following the Supreme Court's 1947 trilogy, this court understood *Pyramid Motor Freight Corp.*'s teaching, that MCA jurisdiction *vel non* turns on the individual employee's job duties. In *Mitchell v. C & P Shoe Corp.*, 286 F.2d 109 (5th Cir. 1960), we said:

> Because of the view it took of the matter, the court below made no findings on the question of whether *the individual plaintiffs* devoted a 'substantial' part of their work to the interstate operations of the C & P Shoe Corporation. Since *it is activities of the particular employee, rather than the employer, which determine coverage*, we remand the case for such findings.

*Id.* at 114 (emphasis added, footnote omitted).[20]

Two years later, in *Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37 (5th Cir. 1962), this court held that some of the employer's employees fell

---

[20] After the district court made its findings on remand in *Mitchell*, the case was again appealed to this court *sub nom.*, *Wirtz v. C & P Shoe Corp.*, 336 F.2d 21 (5th Cir. 1964).

No. 12-20194

under the MCA because of *their* job duties, but other of the employer's employees did not, because of *their* individual job duties. *See id.* at 42-43.

Until today, the district courts in this circuit have, as we did in *Opelika Royal Crown Bottling Co.*, determined MCA jurisdiction on an employee-by-employee basis, turning separately on each individual employee's job activities. *See, e.g.*, *McCann v. W.C. Pitts Constr. Co.,* No. 3:10-CV-52, 2011 WL 3924855, at *8 (S.D. Miss. Sept. 7, 2011); *Villegas v. Dependable Constr. Servs., Inc.*, No. 4:07-CV-2165, 2008 WL 5137321, at *24-26 (S.D. Tex. Dec. 8, 2008).

In 2010, this court decided *Songer*, 618 F.3d 467, which, the majority says, "effectively forecloses an employee-by-employee analysis." *Ante*, at 8; *see also* 846 F. Supp. 2d at 694. This is a misunderstanding of the case. If the majority were correct, it would mean that the case worked a revolution in the Supreme Court's jurisprudence. *Songer could not* "foreclose[] an employee-by-employee" analysis because the Supreme Court, in *Pyramid Motor Freight Corp.*, held that employee-by-employee analysis is *required*, as did prior panels of this court in *Mitchell* and *Opelika Royal Crown Bottling Co.*, and none of those decisions has been overruled; nor has any statute been amended in a manner that is contended to have altered the requisite individual employee analysis.

In *Songer*, the plaintiffs-employees were full-time truck drivers. 618 F.3d at 468. Their employer had a number of routes, many of which were interstate, and no driver was assigned a dedicated route. *Id.* at 470, 475-76. Routes were assigned by a single "dispatch service" "indiscriminately—*i.e.*, any driver could be called upon at any time to make an interstate or intrastate trip." *Id.* at 470. "The drivers' employment could be terminated if they refused an assignment." *Id.* "In other words, any driver could have been assigned to an interstate trip."

37

*Id*. at 475.  Accordingly, the evidence showed that "all the drivers," all of whom accepted routes from the same dispatch service, had a reasonable likelihood of driving interstate.  *Id*. at 476.

Nowhere in *Songer*'s analysis did this court make a determination of reasonable likelihood *vel non* of driving interstate by dint of an employee's membership in any sort of judicially defined "group" or "class," as the district court and the majority did here.  In *Songer*, this court simply made the common sense observation that, because of company policies that were *factually common to all employees* (*i.e.*, the indiscriminate assignment of interstate trips), *each and every* employee, all of whom had the *same* likelihood of driving interstate, was reasonably likely to drive interstate.  *See id*. at 470 ("*any* driver could be called upon at any time to [drive] interstate") (emphasis added).  *Cf. Brennan v. Schwerman Trucking Co. of Va., Inc.*, 540 F.2d 1200, 1205 (4th Cir. 1976) (holding that, because interstate and intrastate trips were assigned indiscriminately among the company's drivers, "*each of [the] drivers* may affect the safety of operation of motor vehicles engaged in interstate commerce") (emphasis added).  In other words, *Songer*, no differently than any other case before it, did nothing more than examine the relevant evidence to make an individual determination as to MCA jurisdiction with respect to each employee, based on the circumstances of that employee's job.

In sum, following the Supreme Court's 1947 trilogy, this court has, in accordance with *Pyramid Motor Freight Corp.*'s mandate, determined MCA jurisdiction on an individual basis, turning on each employee's actual job circumstances.

**5.**  *Other Circuits' Post-1947 Jurisprudence*

After 1947, at least three of our sister circuits have, like us, acknowledged *Pyramid Motor Freight Corp.*'s requirement for individual analysis of each employee's actual job duties.  The Third Circuit has stated that, to determine MCA jurisdiction, the court must determine "whether *each* plaintiff, during the relevant time periods, performed duties which substantially affected the safety of operation."  *Harshman v. Well Serv., Inc.*, 248 F. Supp. 953, 958 (W.D. Pa. 1964) (emphasis added), *aff'd,* 355 F.2d 206 (3d Cir. 1965) (affirming "for the reasons so well stated in the opinion of [the district court]").  The Fourth Circuit likewise agrees that the court must focus on the employee's actual activities "on an *individual* basis."  *Troutt*, 107 F.3d at 1107-10.  And, the Seventh Circuit has explained that it is erroneous to determine MCA jurisdiction on the basis of "the employer's operations" because MCA jurisdiction "depends upon the activities of the *individual employees*."  *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 234-35 (7th Cir. 1961) (emphasis added).

**6.**  *The Department of Labor Regulations and Other Post-1947 Developments*

In 1948, the DOL, which was then (and is still now) charged with enforcing the FLSA, *see* § 4, 52 Stat. 1060, 1061; 29 U.S.C. § 204, promulgated the regulations codified at 29 C.F.R. § 782, the regulations on which the district court and the majority here rely.  13 Fed. Reg. 2346 (codified at 29 C.F.R. § 782 (1949)).  The DOL's regulations have been amended only slightly over the years, so they are today almost identical to their original enactment in 1948.  *Compare* 29 C.F.R. § 782 (current), *with* 13 Fed. Reg. 2346 (1948).

The DOL's regulations state their purpose on their face: they reflect "the construction of the law [regarding the MCA exemption] which the [DOL] believes

to be correct in the light of the decisions of the courts and the Interstate Commerce Commission." *Id.* And indeed, the DOL's regulations do nothing more than describe the jurisprudential principles that followed from the above-discussed ICC jurisdictional pronouncements and case law, primarily the Supreme Court's 1947 trilogy.

29 C.F.R. § 782.2 says: "The [MCA exemption] depends both on the class to which his employer belongs and on the class of work involved in the employee's job." It continues:

> The power of the Secretary of Transportation [previously "Interstate Commerce Commission"] to establish maximum hours and qualifications of service of employees, on which exemption depends, extends to those classes of employees and those only who (1) are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his [previously "the Commission's"] jurisdiction under section 204 of the Motor Carrier Act and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

§ 782.2. The regulations proceed to discuss the "classes of employees" that the ICC had determined fall under MCA jurisdiction: "drivers" (§ 782.3 (citing Ex parte No. MC–2; Ex parte No. MC–3; Ex Parte No. MC–4)), "drivers' helpers" (§ 782.4 (citing Ex Parte No. MC–2)), "loaders" (§ 782.5 (citing Ex parte No. MC–2)), and "mechanics" (§ 782.6 (citing Ex parte No. MC–2)).

Over a decade later, in 1966, the DOT was created and authority to enforce the MCA was transferred to it from the ICC. Department of Transportation Act, § 6(e), 80 Stat. 931, 939.

No. 12-20194

In 1971, the DOL revised its § 782 regulations to recognize the transfer of MCA authority from the ICC to the DOT. 36 Fed. Reg. 21778. Aside from acknowledging the transfer of authority, the regulations were substantially untouched. Since that 1971 revision, the DOL has never again revised the § 782 regulations.

As for the DOT, since 1966, when it was created and given authority to enforce the MCA, it has never issued regulations on the maximum scope of its jurisdiction over qualifications and maximum hours of service as had the ICC decades before.[21] Thus, although the ICC lost its MCA authority in 1966, its 1930s and 1940s regulations still represent the most recent expression of the official agency view of the scope of MCA jurisdiction.

In 1995, the ICC was eliminated entirely. ICC Termination Act, § 101, 109 Stat. 803 ("The Interstate Commerce Commission is abolished.").

That brings us to today.

### C.

This history makes several things clear. First, the phrase "classes of employees" in the DOL's regulations, on which the district court and the majority here cite in support of their novel analysis, references the four categories of job activities that the ICC decades ago concluded affect the safety of interstate motor vehicle transportation: "drivers," "drivers' helpers," "loaders," and "mechanics." When § 782 says that the MCA exemption "depends on" "the class of work involved in the employee's job" and extends only to certain "classes

---

[21] In 1981, the DOT did, however, issue a "notice of interpretation" regarding its jurisdiction over certain drivers. 46 Fed. Reg. 37902. But that notice of interpretation did not purport to speak as to the maximum scope of the agency's jurisdiction in other respects. *Id.* at 37903 ("This interpretation relates solely to the jurisdiction over drivers.").

No. 12-20194

of employees," what § 782 means is simply that the court, in deference to the ICC's findings of fact, should determine whether the employee's job duties are such that the employee falls under the ICC's definition of a "driver," "driver's helper," "loader," or "mechanic." Put another way, the *only* "class" inquiry contemplated by § 782 is, the court must determine what activities the employee's job entails and whether those activities are such that the employee fits into the ICC's definition of a "driver," "driver's helper," "loader," or "mechanic."[22]

Here, there is no question that some of the employees drive motor vehicles and, hence, are within the ICC's definition of the "drivers" "class" *if and when* they drive interstate. That question, whether the driver-employees at issue in this case are reasonably likely to drive interstate, should be resolved in the ordinary manner, by examining the relevant evidence, drawing reasonable inferences, etc.—in other words, through the "judicial process." *Pyramid Motor Freight Corp.*, 330 U.S. at 707. In reading § 782's reference to "classes of employees" as calling for courts to define *their own* "groups" or "classes" of employees and to determine MCA jurisdiction *vel non* with respect to such judicially defined "groups" or "classes," the district court and majority have committed clear error.

---

[22] It could be contended that, since the ICC's authority under the MCA was transferred to the DOT in 1966 (and the ICC was abolished entirely in 1995), courts ought to determine *de novo* whether job activities affect the safety of motor vehicle transportation rather than deferring to the antiquated ICC findings. But that question should be left for another day. Here, we deal only with driving motor vehicles, and, regardless of what the ICC has said on the topic,"[i]t is obvious that one who drives a vehicle in interstate commerce directly affects the safety of such operations as long as he is driving." *Crooker*, 469 F.2d at 209.

No. 12-20194

Second, it is clear that, until today, in the history of FLSA-and-MCA-exemption litigation, the courts have never defined their own "groups" or "classes" of employees to determine MCA jurisdiction on that basis, as the district court and majority have done here. In *Pyramid Motor Freight Corp.*, and reaffirmed later that same year in *Morris*, the Supreme Court clearly required individual analysis of "each" employee's actual job duties. The district court's and majority's "company-wide," "group"- or "class"-based analysis, which determines MCA jurisdiction based on the activities of a "group" or "class" of employees that the court has defined itself, is in clear conflict. *See Pyramid Motor Freight Corp.*, 330 U.S. at 698, 708 (the district court must "determine whether or not the activities of each [employee]" "affect[] the safety of operation of motor vehicles in interstate or foreign commerce," and the district court may deny overtime pay *only* to "those [employees] who are engaged in such activities"); *Morris*, 332 U.S. at 430 (observing that, "if this were an action to recover overtime compensation for individual employees, it would be necessary to determine" "the extent to which [the employees] devoted themselves to [work affecting transportation safety]"). And, the district court's and majority's analysis conflicts with the prior decisions of this court requiring individual analysis. *Compare ante*, at 8 (adopting "company-wide" analysis and stating that "this court's precedent effectively forecloses an employee-by-employee analysis"), *with Mitchell*, 286 F.2d at 114 (holding that "it is the activities of the particular employee, rather than the employer, which determine coverage"), *and Opelika Royal Crown Bottling Co.*, 299 F.2d at 42-43 (applying individual analysis). Finally, the majority's opinion creates a split with the decisions of at

43

No. 12-20194

least three of our sister circuits. *See Harshman*, 248 F. Supp. at 958, *aff'd*, 355 F.2d 206; *Troutt*, 107 F.3d at 1107-10; *Goldberg*, 291 F.2d at 234-35.

This case involves workers in Texas and Louisiana, and the question is whether they are reasonably likely to drive interstate. To answer that question, the court must examine evidence that is relevant to the work of *those* employees. There is no legal reason the court may point to other employees in Wyoming who are very likely to drive interstate and declare that, as a result of some legal fiction, the same is true of the Texas and Louisiana workers, even if belied by the evidence. The district court's and majority's creation of a "company-wide," "group"- or "class"-based mode of analysis that does just that is in clear conflict with the Supreme Court's mandate that we "determine whether or not the activities of each [employee]" "affect[] the safety of operation of motor vehicles in interstate or foreign commerce" and deny overtime pay *only* to "those [employees] who are engaged in such activities." *Pyramid Motor Freight Corp.*, 330 U.S. at 698, 708.

### III. *The Proper Analysis*

To decide whether the employees here are reasonably likely to drive interstate, rather than merely intrastate, the district court and this court should simply look at the evidence and make a determination *vel non* for each plaintiff-employee. We should look to the testimony about the realities of the job as well as any documentary records. The employee's job description, if the company has issued one, is relevant too, although not dispositive, since it may not reflect the realities of the job. *Pyramid Motor Freight Corp.*, 330 U.S. at 707 (the district court "shall not be concluded by the name which may have been given to [the employee's] position or to the work that he does"); *Ale v. Tenn. Valley Auth.*, 269

44

F.3d 680, 688-89 (6th Cir. 2001) ("[C]ourts must focus on the *actual activities* of the employee in order to determine whether or not he is exempt from the FLSA's overtime regulations.") (emphasis added).

As discussed above, Coil Tubing Services divides its operations into six districts, and the employees at issue here were stationed in four of the six: the Alice, Angleton, and Bridgeport districts in Texas and the Broussard district in Louisiana. The company generally assigns well-servicing jobs to the geographically closest district, and the employees in that district are required to handle the job. If the equipment and personnel needed for a job are not available in the district to which it is assigned, the district can borrow workers and equipment from another district, but, according to the evidence in the record, such instances of inter-district borrowing are "rare" and "exceptional."

Record evidence shows that the vast majority of jobs handled by the Alice, Angleton, Bridgeport, and Broussard districts were purely intrastate jobs—that is, Texas-based workers worked in Texas and Louisiana-based workers worked in Louisiana—and only a tiny number of jobs required crossing state borders. In Alice and Bridgeport, *less than one percent* of the jobs handled by those districts during the period recorded were interstate. In Angleton, *less than two percent* of the jobs were interstate. And, in Broussard, around five percent of the jobs were interstate. Moreover, these figures likely over-represent the actual likelihood of any given employee driving interstate because, when traveling to the jobsite, only one employee would have to drive each vehicle, and others would ride as passengers. Thus, while there was less than a one percent chance—about 0.33% of a chance, the evidence shows—that any given job in the Alice district would involve interstate transportation, there was *even less* than

No. 12-20194

a 0.33% chance of any given Alice *worker* driving interstate for any given job assigned to the district. Inversely, when a worker in the Alice district was given a job that was assigned to that district, there was a greater than 99% chance that the worker would not drive interstate.

The record contains employee testimony that tends to corroborate the unlikelihood of driving interstate or, indeed, driving at all. For example, one employee in the Alice district, Jesus Hernandez, testified that, in his five years working there, he only drove interstate once. An employee in the Angleton district, Cody Patin, testified that, during his half year working there, he only drove a motor vehicle a single time, when he drove "a supervisor's truck to go get lunch for everybody one day." There is similar testimony from a number of other employees in the record.

Based on this evidence, a reasonable factfinder could determine that the likelihood of these field service employees in the Alice, Angleton, Bridgeport, and Broussard districts driving interstate is so minimal and remote, they cannot be "reasonably expected" to be "called upon in the ordinary course of [their] work to [drive interstate]." *Songer*, 618 F.3d at 474; *see Coleman*, 324 F. Supp. at 670; *Kimball*, 504 F. Supp. at 548; *Yaklin*, No. 07-CV-422, 2008 WL 4692419, at *6. Accordingly, there is a genuine dispute of material fact as to the reasonable likelihood of these employees driving interstate.

Regarding the fact that Coil Tubing Services's employees in Wyoming drive interstate very often, there is no factual indication in the record why that is relevant to the Texas and Louisiana employees. True, there is evidence that on "rare" and "exceptional" occasions, one district can borrow another district's employees for a job if needed. But, again, according to the record evidence, such

46

No. 12-20194

instances are unusual, and, importantly, there is no indication in the record that an employee has *ever* been sent from Texas or Louisiana to Wyoming. Thus, a reasonable factfinder could determine that there is simply no reasonable likelihood of a Texas or Louisiana employee being dispatched to participate in a Wyoming job. Contrary to the district court's and the majority's suggestions, this is not a case like *Songer* in which all employees accept their job assignments from a single dispatch. *See* 618 F.3d at 470. In terms of the work that the employees here could be expected to carry out, the record evidence shows material differences between the assignments given to the Wyoming employees and the Texas and Louisiana employees at issue in this case.

The evidence in the record reveals a genuine dispute of material fact as to whether the employees here were reasonably likely to be called upon to drive interstate in the course of their work for Coil Tubing Services. Accordingly, the district court's grant of summary judgment for the company and against the employees on their FLSA claims was improper and should be reversed.

## IV. *Conclusion*

The plaintiffs-employees at issue in this case work in Texas and Louisiana. The evidence shows that they are, as a matter of fact, extremely unlikely to be called upon to drive interstate in the course of their work. Nevertheless, the district court and majority point to other employees in Wyoming who are not parties to this litigation but who *are* likely to drive interstate and, by dint of the legal fiction of "group" or "class" membership, say that the Texas and Louisiana workers are no different—that is, they too are likely to drive interstate, despite the evidence showing the precise opposite. The district court and the majority cite the DOL's regulations and *Songer* as support for their decisions, but they

47

have unfortunately misread and misapplied these sources of law, neither of which support the "group"- or "class"-based analysis that was applied here on a "company-wide basis" to except more than a hundred employees from overtime wages. The law requires, and has always required, individual analysis of each employee's actual job circumstances. It has never been permissible for courts to disregard the actual evidence in favor of legal fictions in which broad swathes of employees are swept together so as to exempt from overtime wages great numbers of employees based on the activities of others. Simply stated, the district court must "determine whether or not the activities of *each* [employee]" are reasonably likely to affect the safety of interstate transportation. *Pyramid Motor Freight Corp.*, 330 U.S. at 707-08 (emphasis added). The evidence shows that the plaintiffs, employees in Texas and Louisiana, are extremely unlikely to drive interstate. The law does not allow us to exempt them from overtime pay based on the job activities of other workers in Wyoming who are not a part of this case.    I respectfully dissent.

48